**UNITED STATES of America**

v.

**Marvin MANDEL et al.**

**Crim. No. HM75–0822.**

United States District Court,
D. Maryland.

March 23, 1976.

As Amended March 31, 1976.

Jervis S. Finney, U.S. Atty. for the District of Maryland, Barnet D. Skolnik, Ronald S. Liebman and Daniel J. Hurson, Asst. U.S. Attys., Baltimore, Md., for the United States of America.

Arnold M. Weiner, Baltimore, Md., for Marvin Mandel.

William G. Hundley, Washington, D.C., for W. Dale Hess.

Thomas C. Green, Washington, D.C., for Harry W. Rodgers, III.

Michael E. Marr, Baltimore, Md., for William A. Rodgers.

Norman P. Ramsey, Baltimore, Md., for Irvin Kovens.

Joseph A. DePaul, College Park, Md., for Ernest N. Cory, Jr.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

On November 24, 1975, the defendants in this case were indicted under 18 U.S.C. § 1341 on twenty counts of mail fraud and under 18 U.S.C. § 1961 et seq., on four counts of prohibited patterns of racketeering activity. The defendants have now moved to dismiss the indictment, arguing, inter alia, that the indictment fails to allege a cognizable scheme to defraud, that it is vague and fatally defective, that it is premised on erroneous and unconstitutional assumptions concerning the duties of the Governor of the State of Maryland, that the racketeering counts are inapplicable on the facts alleged in the indictment, and that the indictment transgresses fundamental constitutional principles concerning the separation of powers and the relationship of the states to the federal government.[1] Defendants have also filed alternative motions to strike certain portions of the indictment, and to certify unresolved questions of state law to the Maryland Court of Appeals. The Court heard oral argument on these motions on March 4, 1976.

## I. THE MAIL FRAUD COUNTS

### A. The Indictment

The indictment in this case charges that, beginning at some point between January 7, 1969, and the spring of 1971, and continuing thereafter until the date of the filing of the indictment, the defendants devised and intended to devise a scheme and artifice:

(a) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties by MARVIN MANDEL, in his official capacities as Governor of the State of Maryland, free from bribery, corruption, partiality, willful omission, bias, dishonesty, deceit, official misconduct and fraud;

(b) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have the state's business and its affairs conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud, and in accordance with the laws and Code of Ethics of the State of Maryland;

(c) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have available and to be made aware of all relevant and pertinent facts and circumstances when: (1) drafting, considering and deliberating upon proposed legislation for the State of Maryland with respect to the

---

1. Motions to dismiss the indictment which are based on allegations of prosecutorial misconduct, prejudicial pretrial publicity and prejudicial pre-indictment delay will be considered separately following a hearing to be held on March 24, 1976.

Maryland horse racing industry and to other matters;

(2) administering the laws of the State of Maryland with respect to the Maryland horse racing industry and to other matters; and

(3) transacting business for and on behalf of the State of Maryland;

(d) To obtain, directly and indirectly, money, property and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, relating to the Marlboro Race Track, the Bowie Race Track, the Security Investment Company, Ray's Point, Inc., and to other matters.

The indictment goes on to allege that the defendants, as a further part of the scheme and artifice to defraud, entered into a "corrupt relationship" with one another in which each of them "would and did act with intent illegally to benefit, directly and indirectly, and through the use of fraud and deception, himself and other defendants." Count 1, paragraph 14. The allegations of the indictment focus primarily on the actions of the defendants with regard to certain transactions and legislation concerning Marlboro Race Track ("Marlboro") and on certain transactions, leases and contracts awarded by the State of Maryland to various enterprises in which the defendants are alleged to have held financial interests.

With regard to Marlboro, the indictment charges that defendants Hess, Kovens, Cory and William A. and Harry W. Rodgers, acquired financial interests in Marlboro in 1971 in a manner designed to conceal their acquisition of such interests. The indictment further charges that those defendants, through the use of a nominee, concealed the fact that defendant Kovens was a true beneficial owner of a financial interest in Marlboro, and that they arranged for another individual falsely to represent himself as the owner of the track. The charge continues that during the 1972 legislative session of the Maryland General Assembly, all of the defendants "would and did fraudulently conceal" from the legislature the "true identities of the owners" of Marlboro, causing the legislators to make decisions on legislative matters financially beneficial to the owners of Marlboro and, later, of Bowie Race Track ("Bowie"), without having the benefit of "complete and accurate information" regarding the identities of those owners. The indictment charges that defendant Mandel "would and did, both personally and through agents, in return for certain financial and other benefits . . . act with intent to aid and assist certain legislation and legislative matters financially beneficial" to Marlboro's owners. The indictment further charges that all of the defendants similarly "fraudulently conceal[ed]" from the Maryland Racing Commission the identities of Marlboro's owners, partially through the submission of a list of owners which is alleged to be substantially false. These actions, like those with respect to the Maryland General Assembly, are alleged to have been designed to cause the Commission to make decisions with respect to racing dates and other matters financially beneficial to the owners of Marlboro and later, Bowie, without the benefit of complete and accurate information regarding the true identities of the owners. As a further part of the scheme and artifice, the indictment charges, the defendants Hess, Kovens, Cory and Harry W. and William A. Rodgers caused to be merged the ownerships of Marlboro and Bowie in 1972, thereby acquiring for themselves financial benefits.

The indictment also charges that it was further a part of the scheme and artifice to defraud that defendant Mandel, as governor, would and did, directly and indirectly, permit and approve the awarding of "various contracts, leases and other benefits to business entities in which" defendants Hess, William A. and Harry W. Rodgers held financial interests, without revealing to the citizens or to the governmental bodies of the state "the full extent and true nature" of his business involvements with those defendants. Those involvements apparently include the "financial and other benefits" which defendant Mandel allegedly received as bribes for the purpose of influencing him in the course of his official duties and for

his aid and assistance with regard to the legislative matters concerning Marlboro. In particular, the indictment charges that defendant Hess transferred to defendant Mandel 4/9 of Hess' interest in the Security Investment Company ("Security"), and concealed that transfer as well as subsequent payments made to defendant Mandel as a consequence of his financial interest in Security, through such means as falsification of tax returns and other documents. In addition, the indictment alleges that defendants Hess, Harry W. and William A. Rodgers "would and did allow" defendant Mandel to acquire a fifteen percent interest in "certain assets of substantial value", later formally owned by Ray's Point, Inc. ("Ray's Point"), and that such interest was concealed through the alteration of a certain record and by other means. The indictment charges further that defendant Mandel, for the purpose of concealing all of the activities noted above, deliberately deceived and misled the citizens of the state in a number of public statements.

While the factual allegations in the indictment make the scheme appear to be a complex and subtle one, the thrust of the charges is simple. In essence, the indictment charges that the defendants devised a scheme to defraud the citizens and the state of Maryland by bribing the Governor to assist legislation which would be financially beneficial to the owners of Marlboro (and later Bowie), the identities of such owners being deliberately concealed from the public, the legislature and the Racing Commission by all of the defendants. The indictment also charges that it was further a part of the scheme that defendant Mandel use his powers as Governor to channel state business to business entities in which defendants Hess, William A. and Harry W. Rodgers had financial interests, without revealing to the public or the governmental bodies involved his own business involvement with those defendants, including those interests in Security and Ray's Point which he had received from those defendants as bribes, and the existence of which was actively concealed by defendants Mandel, Hess and William A. and Harry W. Rodgers.

### B. Does the indictment allege a cognizable scheme to defraud?

Title 18 U.S.C. § 1341 provides, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The elements of the offense of mail fraud are (1) the intentional devising of a scheme to defraud, and (2) a use of the mails in its furtherance. *Linden v. United States*, 254 F.2d 560, 567 (4th Cir. 1958); *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1953). A "scheme to defraud" within the meaning of the statute may be defined as the intentional use of false or fraudulent representations for the purpose of gaining a valuable undue advantage or working some injury to something of value held by another. *Cf. Blachly v. United States*, 380 F.2d 665 (5th Cir. 1967); *United States v. Proctor & Gamble Co.*, 47 F.Supp. 676, 678 (D.Mass.1942).

The initial question posed by the defendants is whether the indictment alleges a scheme to defraud within the meaning of the mail fraud statute. They argue that the indictment fails to allege a scheme to defraud because (1) the facts alleged in the indictment reveal no intentional use of false or fraudulent representations by any of the defendants and (2) the intangible rights allegedly defrauded by the scheme do not constitute "something of value" whose dep-

rivation can be punished under the mail fraud statute. The Court will address these two arguments in order.

### 1. Does the indictment allege intentional use of fraudulent representations by the defendants?

The defendants contend that the allegations of the indictment charging them with fraudulent representations and conduct are premised on assumptions concerning the duties of the defendants as private citizens and those of the Governor as a state official which are either incorrect as a matter of law or unconstitutional as applied. The defendants argue that the alleged failure of the Governor to comply with the state Code of Ethics cannot constitute fraud because the Code is inapplicable to the Governor as an elected constitutional officer of the state; that the concealment of various interests in business entities and of the identities of the owners of Marlboro from the public, the General Assembly, and the Racing Commission, cannot constitute fraudulent behavior on the part of private citizens because there is no affirmative duty to disclose such information; that the Governor's failure to reveal his business involvements with certain of the other defendants cannot be fraudulent because he is under no duty imposed by state law to reveal such information to the public and the state, and for the further reason that such a claimed conflict of interest amounts at best only to a "constructive fraud" which is not sufficient to sustain a prosecution under the federal mail fraud statute. In essence, the defendants argue that since none of the conduct alleged in the indictment was in violation of any duty imposed by state law on any of the defendants, the indictment has failed to allege that the defendants engaged in the intentional use of false or fraudulent representations.[2]

Since the existence of intent to use fraudulent representations is a question for the jury to decide, an alternative way of phrasing the challenge posed by the defendants is to ask if the indictment alleges any conduct from which, in light of the considerations urged by the defendants, a jury could properly infer the existence of intent to deceive.

■■■ A jury may find a representation to be false or fraudulent if it finds that the representation was known to be untrue when made, or if made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive. *United States v. New South Farm & Home Co.*, 241 U.S. 64, 71, 36 S.Ct. 505, 507–08, 60 L.Ed. 890, 896 (1916); *United States v. Andreadis*, 366 F.2d 423, 430 (2d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). A representation is deceptive if the reasonably probable effect of the representation would be to deceive or mislead a person of ordinary prudence. A jury may consider actions and omissions as well as affirmative statements, for it is well-settled that false or fraudulent representations may also be made by statements of half truths or the concealment of material facts, *Durland v. United States*, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709, 711–12 (1896). As the Supreme Court noted in *Smith v. Richards*, 38 U.S. (13 Pet.) 26, 10 L.Ed. 42, 47 (1839), quoting from 1 Story's Equity 201, 202:

> [W]here the party intentionally, or by design misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap him or cheat him, or to obtain an undue advantage of him, in every such case there is a positive fraud in the truest sense of the terms . . . And the misrepresentation may be as well by deeds or acts, as by words—by artifices to mislead, as by positive assertions.

Quoted in *United States v. Proctor & Gamble, supra*, at 678.

---

**2.** The defendants' further argument, that the imposition of such duties on the office of the Governor as a consequence of the operation of a general federal criminal law such as the mail fraud statute, would alter the state's plan for the allocation of governmental functions and violate constitutional principles and the federal-state abstention doctrine, is addressed in Part III of this Memorandum.

■ In considering what representations or conduct a jury may properly consider in determining whether defendants acted in good faith or with intent to deceive, the Court notes that the indictment alleges instances of positive and active misrepresentation. For example, paragraph 19 of Count 1 charges that several defendants arranged for another individual falsely to represent himself as the new owner of Marlboro. The indictment also charges that defendants Mandel and Hess made fraudulent representations on their income tax returns. Paragraph 29 of Count 1 charges that defendant Cory submitted to the Racing Commission a list of purported Marlboro owners which was in substantial part false. Defendant Mandel is accused of making various public statements with the intent to deceive and mislead the citizens of Maryland. The defendants apparently argue that such representations, which are alleged to be part of a scheme to "conceal" from the public and the state information regarding the ownership of Marlboro and defendant Mandel's business involvements with other defendants, cannot be fraudulent because the public and the state had no right in the first instance to any such information. Such an argument is not persuasive. Even in the absence of any affirmative duty to disclose such facts, these statements would be made fraudulently if made with knowledge of their falsity and their likelihood to mislead and deceive. Whether or not the particular representations are false, and made with such knowledge, is of course a question that the jury must determine from competent evidence produced at trial.

■ Similarly, the acts of concealment which the indictment alleges are themselves capable of being fraudulent misrepresentations, if the acts are done with the intention of misleading or deceiving. Thus, if the defendants acted to conceal the identities of the owners of Marlboro, with the intent of causing the Legislature to believe that certain persons were owners when in reality they were not, such acts of concealment would constitute fraudulent representations, even in the absence of any duty to disclose the "true" identity of the owners. Thus the defendants' argument which seeks to take refuge in the fact that there is no "affirmative duty to disclose" such matters as a matter of state law is misplaced.

■ As a matter of federal criminal law, in fact, a jury may also infer intent to deceive from actions which the actor knows, or should know, are contrary to generally accepted principles of honesty and fair play. This could include a "failure to disclose" information if, in the context of the factual situation, a defendant knew or should have known that commonly accepted standards of morality would demand that such disclosure be made. As the Fifth Circuit noted in *Blachly v. United States, supra,* at 671:

The fraudulent aspect of the scheme to 'defraud' is measured by a nontechnical standard. *Gregory v. United States,* [253 F.2d 104, 109 (5th Cir. 1958)]. Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.' *Ibid.* This is indeed broad. For as Judge Holmes once observed, '[t]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.' [citations omitted]

It is this aspect of the statute that has been "broadly construed" in numerous mail fraud cases. *See, e.g., Durland v. United States, supra; United States v. McKay,* 45 F.Supp. 1007 (E.D.Mich.1942).

■ In *Shushan v. United States,* 117 F.2d 110 (5th Cir.), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941), for example, the defendant was a public official who received bribes in exchange for his influence in securing contracts for certain brokers on more favorable terms than they otherwise would have received. The failure of the defendant to disclose his personal interest in the contracts which he approved along with other members of the government was "so irreconcilable with public duty and private morality that neither he nor anyone privy to it could intend fairness

and honesty." *Shushan v. United States, supra,* at 120. Under such circumstances, a failure to disclose constitutes a fraudulent representation because others, operating under common standards of honesty that would require disclosure, are led to assume from silence that there exists no conflict of interest. While the series of inferences that must be drawn from a failure to disclose are difficult—the jury must be convinced that the failure to disclose was an intentional omission, and made with the intent to deceive and mislead—a jury may properly consider generally accepted standards of honesty to determine if the actor did know or should have known that he had a moral obligation to reveal, and conclude from the failure to do so that the actor acted with intent to deceive and mislead. When an actor also takes steps to conceal the facts which he fails to disclose, the inference that he acts with intent to deceive is easier to make.

Since commonly accepted standards of honesty and fairness operate independently of any duties imposed by statutes, regulations, or codes, it is no argument to say that a failure to disclose or active concealment of facts made with the intent to deceive is not fraudulent because not specifically prohibited by an express provision in the law. In considering whether someone acted with intent to deceive, a jury must of course consider the totality of the circumstances. *United States v. Keane,* 522 F.2d 534, 544 (7th Cir. 1975), *pet. for cert. filed,* 44 USLW 3379 (U.S. Dec. 19, 1975). Even acts which are innocent in and of themselves may be fraudulent in combination if part of an overall scheme to deceive or mislead. *Holmes v. United States,* 134 F.2d 125 (8th Cir. 1943), *cert. denied,* 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722.

A jury may also infer from the violation of a known positive duty an intent to deceive. Such positive duties arise from laws, regulations, and codes, as well as from principles "long settled by the courts in civil and criminal cases alike." *Foshay v. United States,* 68 F.2d 205, 211 (8th Cir. 1933), quoted in *Epstein v. United States,* 174 F.2d 754, 767 (6th Cir. 1949).

In determining whether an act or omission was done with intent to deceive, a jury may properly consider whether the act or omission violated any law, regulation or code which establishes standards of conduct reasonably related to the discharge of specific duties and modes of conduct which are related to the issues of the case. *See United States v. Morlang,* 531 F.2d 183, at 191, No. 74–2071 (4th Cir., 1975); *United States v. Keane, supra,* 522 F.2d at 553; *United States v. George,* 477 F.2d 508, 515 (7th Cir. 1973), *cert. denied,* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973). Whether or not the violation could be punished as a matter of state law is beside the point in a mail fraud prosecution, as the only relevance which such a regulation, law, or code has in a mail fraud prosecution is in determining the question whether the act or omission was done with intent to deceive. That is to say, if an actor commits an act which he knows to be in violation of a duty imposed upon him by the code, law, or regulation, a jury may draw the inference that the act was done willfully and wrongfully, and, depending on the nature of the violation, with intent to deceive.[3]

Some acts which violate duties are relevant to mail fraud prosecutions, not because the jury can infer an intent to deceive from them, but because the jury can infer an intent to injure something of value held by another. To use the bribery example, it is evident that anti-bribery regulations are passed to protect important public interests in effective and honest government. A jury may infer from a knowing violation of a bribery statute that the act is done with intent to injure that interest. *See* discussion, page 1015, *infra.*

---

**3.** An example of an act in violation of a duty from which a jury could infer an intent to deceive is a failure to disclose a conflict of interest or to abstain from voting on issues in which one has a personal financial stake. Not all acts which violate duties can support an inference of intent to deceive. For example, accepting a bribe in willful violation of a regulation, but doing so openly creates no inference that the act is being done with intent to deceive or mislead. The act may be dishonest, but it is not deceitful. However, *concealing* such a bribe would be deceitful for the reason that it creates the appearance of honesty when in fact there is partiality.

In the present case, the indictment charges that defendant Mandel's alleged receipt of bribes, and failure to reveal his personal interest in the business affairs of other defendants who were beneficiaries of state action, violated the Code of Ethics of the state of Maryland, found at Md.Ann. Code, cum.supp. to Vol. 9A, pp. 151 *et seq.* (1975). Defendants strongly urge that the Code was never meant to apply to the Governor, since as a matter of state constitutional law, the duties of the office of Governor can be altered only by constitutional amendment. In support of this argument, defendants have referred the Court to the Report of Committee to Submit a Code of Ethics which suggests that the drafters of the Code intended to exempt constitutionally elected officers from its provisions. The defendants have requested that the Court, in the event it does not dismiss the indictment, should either strike all references to the Code from the indictment or, in the alternative, certify the question as an unresolved question of state law to the Maryland Court of Appeals.

What the defendants overlook in making this argument is the fact that even were the Maryland Court of Appeals to find that the provisions of the Code do not apply to Governor Mandel, this prosecution would go forward, since the question of whether or not a certain course of conduct is punishable under state laws or regulations is entirely beside the point and immaterial to a mail fraud prosecution. *See, e.g., United States v. Keane, supra,* 522 F.2d 554 n. 38 and 556. The much narrower question is whether the defendant's alleged violation of the Code has any relevance to show the defendant's intent to deceive or to injure something of value held by another (see note 3), and that is a question which largely depends on the evidence to be shown at trial. If the Code sets out a standard of conduct reasonably related to the discharge of specific duties and modes of conduct

relevant to the actions of the defendants in this case, an intentional violation of the Code may be admissible as evidence of the defendant's dishonest or fraudulent intent, regardless of whether, as a matter of state law, the violation could be punished. In this sense, the Code operates no differently from commonly accepted standards of honesty and fairness, discussed *supra.* For these reasons, the Court finds that it need not reach the issue of whether, as a matter of state law, the Code applies to the Governor of the State.

As the indictment presently stands, however, it contains the clear implication that the Code of Ethics is applicable to defendant Mandel and that its violation, in and of itself, constitutes a fraud on the citizens and state of Maryland. *See* Count 1, ¶ ¶ 12 and 13(b). As stated before, whether or not the act which violated the Code is fraudulent depends on whether it was done with intent to defraud, and the only relevance of the Code is to the issue of intent. Since it is possible that the evidence at trial would fail to demonstrate the relevancy of the Code on this issue, and since the indictment as presently written has a prejudicial potential for confusing jurors as to the law, the references in the indictment to the Code of Ethics are surplusage and the Court will order them stricken. Rule 7(d), F.R.Crim.P.

Intent may also be inferred from acts which violate known positive duties imposed by principles established by case law, such as obligations imposed on fiduciaries. Those obligations are relevant here because, as the Fifth Circuit noted in *Shushan v. United States, supra,*

"No trustee has more sacred duties than a public official."

117 F.2d at 115. The Governor of Maryland, as a matter well-settled both in federal and state law, exercises fiduciary duties as a trustee for the citizens and state of Maryland.[4] If a fiduciary represents to

---

4. The Declaration of Rights of the Maryland Constitution, Art. 6, declares that "all persons invested with the Legislative or Executive powers of the Government are the Trustees of the Public, and, as such, accountable for their conduct." Cases decided in the Maryland courts make it clear that the duties of public officials are fiduciary in character and are to be exer-

his trust, through words or conduct, that he is faithfully fulfilling his duties as a fiduciary, when in fact he is not doing so, a jury may properly consider such representations as fraudulent and made with intent to deceive. Thus, for example, if a fiduciary has a personal conflict of interest with his duties as a fiduciary to a trust, but fails to disclose that conflict or acts to conceal that conflict from the trust, such actions are fraudulent if made with the intent to deceive. *United States v. Buckner*, 108 F.2d 921 (2d Cir. 1940); *United States v. Hoffa*, 205 F.Supp. 710 (S.D.Fla.1972). Whether such fraudulent representations constitute "active fraud" or "constructive fraud" depends on the further showing that they were made for the purpose of gaining some valuable undue advantage or injuring something of value to the trust. *Epstein v. United States, supra; see* discussion at p. 1013, *infra.*

■ From the above discussion, it should be evident that the indictment does allege the intentional use of fraudulent representations by the defendants. It alleges positive and active misrepresentations; acts of willful concealment; acts possibly contrary to accepted principles of honesty and fairness; and acts in violation of positive duties. These are all acts which a jury may consider in determining whether defendants acted in good faith, or with intent to deceive. None of the acts above depend on an independent violation of a duty imposed by state law for a finding that they constituted fraudulent representations for the purposes of the mail fraud statute.

Consequently, defendants' argument that the actions did not violate duties imposed by state law is beside the point, and does not require that the indictment be dismissed.

cised as a public trust. *See, e.g., Kerpelman v. Board of Public Works,* 261 Md. 436, 276 A.2d 56 (1971).

**5.** The government notes that the indictment, in paragraph 13(d) of Count 1, charges that the scheme to defraud was for the purpose of obtaining money and property by means of false and fraudulent pretenses. While this allegation would save the indictment from dismissal, as it

**2.** *Does the indictment allege that the defendants acted with the purpose of gaining a valuable undue advantage or injuring something of value held by another?*

The defendants also contend that the indictment fails to allege a scheme to defraud, arguing that a scheme, to be within the provisions of the statute, must be one that contemplates an injury to something of value which can be defined in terms of economic harm or pecuniary loss. They argue the scheme alleged here, to defraud the citizens and the state of such intangible rights as the right to honest government, the right to faithful and loyal services of a public official, and the right to have available and be aware of relevant facts and circumstances when considering legislation and transacting business for the state, does not constitute a scheme to defraud within the meaning of the statute because a scheme to deprive citizens and the state of such intangible rights could not, even if successful, result in any definable economic harm to the citizens or the state of Maryland.

■ The mail fraud statute makes unlawful the use of the mails in execution of "*any* scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (emphasis added). A logical interpretation of that language is that Congress, by expressly limiting the second clause to money or property, did not limit "any scheme or artifice to defraud" to those which contemplated the gaining of money or property, and courts have so construed it. *See, e.g., United States v. States*, 488 F.2d 761, 764 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).[5]

clearly tracks the language of the statute, it does not address the separate question whether the defrauding of the intangible rights may also stand as proper charges. Nor does it imply, as the government suggests, that there was pecuniary loss; it merely refers to the defendants' intended pecuniary gain, and it is not possible from that charge to identify any specific pecuniary loss to citizens of the state.

Undaunted, the defendants suggest that a close reading of representative mail fraud cases indicates that courts have limited the reach of the statute to those schemes which contemplate an injury definable in terms of economic harm or pecuniary loss, citing, inter alia, *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924); *United States v. Randle*, 39 F.Supp. 759 (W.D.La.1941); *Epstein v. United States, supra; United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), and *United States v. Koenig*, 388 F.Supp. 670 (S.D.N.Y.1974).

The government counters with a number of recent cases expressly considering the question in circumstances similar to those here, i.e., involving mail fraud prosecutions of public officials engaged in bribery and other misconduct. *United States v. Faser*, 303 F.Supp. 380 (E.D.La.1969); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. Barrett*, 505 F.2d 1091, 1109 n. 3 (7th Cir. 1974) (Stevens, J., dissenting); *United States v. Keane, supra*, 522 F.2d 534, 547–549; *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975); *but see United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975). *See also United States v. States, supra*. The government contends that these cases represent no novel and radical application of the statute, but rather depend on principles well-established in mail fraud prosecutions, and should be followed here.

The case of *Hammerschmidt, supra*, on which the defendants heavily rely, simply does not support the conclusion that the reach of the statute is confined to schemes to defraud which contemplate economic harm or pecuniary loss. The Supreme Court in that case was faced with the question whether the act of distributing handbills urging resistance to the draft could be considered "fraudulent" for the purposes of a prosecution for the crime of conspiracy to defraud the United States. In support of the argument that acts urging disobedience to laws were "fraudulent", the government cited the case of *Horman v. United States*, 116 F. 350 (6th Cir. 1902), a mail fraud case, which had held that a "scheme to defraud" included simple blackmail letters which involved no element of trickery or deception. The Circuit Court in *Horman* had reasoned that a scheme was fraudulent, even in the absence of an element of deceit and trickery, if there was merely a "wrongful purpose in injuring one in his property rights." In other words, the Circuit Court had concluded in *Horman* that the showing of a dishonest intent was the equivalent of a showing of fraudulent intent to deceive. The Supreme Court in *Hammerschmidt*, noting that the effect of such a holding would be to make every dishonest taking a federal crime, sharply criticized the *Horman* decision, stating that it

> went to the verge and should be confined to pecuniary or property injury inflicted by a scheme to use the mails for the purpose.

265 U.S. 182, 188–89, 44 S.Ct. 511, 512, 68 L.Ed. 968, 970. The Court went on to deny the applicability of the *Horman* definition of fraud to the case before it, and held that the act of urging disobedience to a law was not "fraudulent" because it involved no acts of deception or trickery.

As subsequently clarified by *Fasulo v. United States*, 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926), *Hammerschmidt* was concerned only with limiting the application of the definition of "scheme to defraud" used in *Horman* to fact situations similar to those involved in *Horman*. The Court's admonition to limit the *Horman* rule to cases of pecuniary or property injury was thus not addressed to mail fraud cases in general, but to the limits of the application of the *Horman* decision. The Court in *Hammerschmidt* simply does not address the issue whether the scope of the mail fraud statute was limited to schemes contemplating economic or pecuniary harm; indeed, in discussing the meaning of the words "to defraud", the Court indicates that they usually "signify the deprivation of *something of value* by trick, deceit, chicane or overreaching." 265 U.S. at 188, 44 S.Ct. at 512, 68 L.Ed. at 970 (emphasis added).

*United States v. Randle, supra,* is the only case cited by the defendants which explicitly considers the question whether the scope of the statute is limited to schemes contemplating economic harm. In concluding that a scheme to rig an election by making false election returns did not contemplate economic harm to the state or the candidates and consequently did not constitute a scheme to defraud within the meaning of the statute, the Court in *Randle* relied on an erroneous interpretation of *Hammerschmidt* and on cases construing other statutes. The case has been strongly criticized. *See United States v. States, supra,* 488 F.2d at 765. Further, the Court in *Randle* had simply ignored at least two prior decisions to the contrary. *United States v. Aczel,* 219 F. 917 (D.Ind.1915); *United States v. Classic,* 35 F.Supp. 457 (E.D.La.1940).

None of the other cases cited by defendants explicitly discuss the scope of the statute in terms of definable "economic harm". In the majority of those cases, economic harm existed along with harm to intangible rights, and consequently the courts never had occasion to discuss the question. On the other hand, the cases cited by the government, which do explicitly consider the question, have held that the scope of the statute is not limited to schemes contemplating economic harm. *See, e.g., United States v. States, supra; United States v. Faser, supra;* and the string of Seventh Circuit cases noted *supra.* Although these cases are recent, they rely on older cases which have condemned schemes to defraud which contemplated injuries to intangible rights as well as to property.

For example, a number of courts have noted that a scheme to deprive an employer of the "faithful and loyal services" of an employee constitutes a scheme to defraud within the meaning of the mail fraud statute. *United States v. Proctor & Gamble Co.,* 47 F.Supp. 676 (D.Mass.1942); *Abbott v. United States,* 239 F.2d 310 (5th Cir. 1956); *United States v. George,* 477 F.2d 508 (7th Cir. 1973); *United States v. Faser,* 303 F.Supp. 380 (E.D.La.1969); *United States v. Bryza,* 522 F.2d 414 (7th Cir. 1975). While the defendants argue that in each of these cases there was also economic injury to the employer in the sense that the employee was either diverting secret profits to himself which rightfully belonged to the employer, or preventing the employer from having relevant knowledge of a material fact which could have altered his bargaining position so that he could have made a better bargain, the language of the cases is broad and is addressed, not to the economic harm, but to the deprivation of the employee's faithful services. In reviewing the *Proctor & Gamble* case, the Seventh Circuit noted recently,

> The faithful services rationale is applicable to the instant case and has found support in a variety of different factual situations. For example, in *United States v. Proctor & Gamble Co.,* 47 F.Supp. 676 (D.Mass.1942), defendant companies were charged with obtaining confidential information from employees of a competitor. Upholding the viability of a mail fraud prosecution, the court focused not upon the property right represented by the information, but upon the deprivation of the employees' loyal services:
>
>> 'When one tampers with [the employer-employee] relationship for the purpose of causing the employee to breach his duty he in effect is defrauding the employer of a lawful right. The actual deception that is practiced is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.'

*United States v. Bryza,* 522 F.2d 414, 421. The "loyal and faithful services" analysis was recently applied as an alternative rationale for the holding in *United States v. Faser, supra,* that public officials accepting a bribe to deposit public funds in a certain bank violated the mail fraud statute even though there was no allegation in the indictment that the actions defrauded anyone of something tangible that could be defined in pecuniary terms. The Court held,

It is thus the opinion of this Court that the indictment does, in fact, and by necessary inference, charge the defendant with defrauding the State of Louisiana out of actual cash money. But even if that were not so, it is further the opinion of this Court that the thing out of which it is charged the State was defrauded need not necessarily be that which can be measured in terms of money or property. It is the opinion of this Court that it is a violation of the statute in question if a person defrauds the State out of the 'loyal and faithful services of an employee.'

303 F.Supp. at 384.

A number of cases have also recognized that a citizen's intangible right to have his government conducted honestly is "something of value" whose deprivation may fall within the meaning of "scheme to defraud" in the mail fraud statute. *Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941), *cert. denied*, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531; *Bradford v. United States*, 129 F.2d 274 (5th Cir. 1942); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. Keane*, 522 F.2d 534 (7th Cir. 1975); *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975). These cases, involving misconduct by public officials, indicate that schemes to corrupt the honest administration of government are harmful for at least two reasons: (1) because they deprive the public of the faithful performance of the fiduciary duties of the public official, and (2) because they deprive the citizens and the state of the "loyal and faithful services" of an employee. The *Shushan* case, *supra*, relied on the former analysis:

> No trustee has more sacred duties than a public official and any scheme to corrupt such an [sic] one must in the federal law be considered a scheme to defraud.

117 F.2d 110, 115. The Court went on to cite various cases, civil and criminal, involving other statutes and principles of fiduciary duty under common law, to illustrate the "essential immorality" of such schemes.

The Eighth Circuit, in reviewing *Shushan*, noted recently that

> In *Shushan* there is the implication that a scheme to gain personal favors from public officials is a scheme to defraud the public, although the interest lost by the public can be described no more concretely than as an intangible right to the proper and honest administration of government.

*United States v. States, supra*, 488 F.2d at 766.

The cases have also recognized that there is a scheme to defraud where the misrepresentation or concealment of a fact material to a bargain deprives a purchaser of the opportunity to make the best bargain, even where the bargain he has struck is a reasonable or even excellent one. *United States v. Rowe*, 56 F.2d 747 (2d Cir. 1932); *United States v. George, supra*; *United States v. Barrett, supra*. As Judge Learned Hand noted in the *Rowe* case,

> A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a *quid pro quo* of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.

56 F.2d 747, 749.

The defendants urge that cases involving wrongs caused by a lost chance to bargain with relevant and material facts, and those caused by breaches of fiduciary duties, require a showing of economic harm to elevate them from mere "constructive frauds" which cannot be punished under the mail fraud statute to "actual frauds" which can be so punished, citing *United States v. Regent Office Supply Co., supra; Epstein v. United States, supra*; and *United States v. Koenig*, 388 F.Supp. 670 (S.D.N.Y.1974). Defendants are correct that constructive frauds cannot be punished under the mail fraud statute, but seem to misconstrue the difference between constructive and actual frauds. Constructive frauds are created in the law by operation of principles of equity,

without regard to the actual existence of any wrongful intent to defraud. The same set of circumstances which gives rise to a finding of "constructive fraud" may also support a finding of "actual fraud" if the fraudulent representations were made with *intent* to gain some valuable undue advantage or work some injury to something of value. *See, e.g., Epstein v. United States, supra,* 174 F.2d at 766; *United States v. Lichota,* 351 F.2d 81, 89 (6th Cir. 1965); *Shushan v. United States, supra,* at 115. Constructive frauds have no place in criminal law because the burden is upon the government to show beyond a reasonable doubt every element of the offense charged, including, in mail fraud cases, the existence of the criminal intent to defraud. But whether or not the defendants so acted with intent in the present case is a question for the jury.

A question of intent usually resolves itself into one of fact. We arrive at one's intention by taking hold of certain circumstances, extraneous though they may be, and reasoning out the purpose in doing the act. It is a mental process, but a man's intention is really a question of fact to be arrived at by the trier of the facts in the exercise of reasonable discretion, after considering all the circumstances connected with the act charged.

*Stone v. United States,* 113 F.2d 70, 74–75 (6th Cir. 1940), quoted in *United States v. Lichota, supra,* at 89–90.

The cases cited by the defendants do not hold otherwise. In the *Regent Office Supply Co.* case, salesmen deliberately employed false representations in order to gain access to purchasers of office supplies. They misrepresented their identities, the reasons for which the supplies were available, and the means by which they had come to prospective purchasers. There was no misrepresentation as to the quality, adequacy or the identity of the office supplies offered. The government argued that the purchasers had been defrauded of their right to give their patronage based on honest information and that the competitors of the defendants who did not use such fraudulent tactics were also harmed. The Court rejected that argument and reversed the defendants' convictions, holding that the government had failed to prove that the fraudulent representations had been made for the purpose of injuring something of value held by the purchasers:

Although proof that the injury was accomplished is not required to convict under 1341, we believe that the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful.

421 F.2d at 1182. What the court held was that the nature of the scheme itself was not such as to support an inference that the actors intended to work some injury as a consequence of the scheme, absent other evidence establishing that intent. The fact that there was proof of intent to deceive did not establish proof of intent to employ deceit for wrongful purposes.

Similarly, in *Epstein v. United States, supra,* the court found that the failure of the defendants who were directors of a corporation, to disclose to the corporation that they had an interest in a company from which the corporation bought supplies, amounted, on the proof offered at trial, only to a breach of their fiduciary duties, and a constructive fraud. The government failed to show that the defendants intended by the nondisclosure to work any harm to the corporation. It was this intent to injure that the Court was referring to when it commented:

[A] mere disclosure of interest could not convert an actual fraud with a wrongful purpose to injure or deceive, into an honest, moral transaction with a purpose to benefit.

174 F.2d at 768. At most, the court said, the government proved a failure to disclose an interest in breach of fiduciary duties; without an intent to do harm by that nondisclosure, it constituted only a constructive fraud which could not be punished under the mail fraud statute.

The case of *United States v. Koenig,* 388 F.Supp. 670 (S.D.N.Y.1974), cited by de-

fendants, is similar. The court there held that the government had again failed to prove that the defendants intended harm by their nondisclosure of certain details of a stock transaction. Not only did the court find the challenged materials non-deceptive, but it found that the transaction was meant to benefit the shareholders, which intent negated the existence of an intent to harm.

In none of these cases do the courts say that the harm must be measurable in terms of money. All they say is that "some actual injury, however slight" must either be intended by the actors or be a reasonably probable result of the deceitful representations if successful. Again, whether or not the actors so intended is a question for a jury to determine. In some circumstances, the nature of the scheme may be such that a jury could infer from the scheme itself an intent to harm. *See* note 3, *supra.* Certainly that inference is easier to make where the scheme's object is to obtain money or property from someone else. But the fact that the government may be less likely to convince a jury beyond a reasonable doubt that there is an intent to harm where the object harmed is less tangible than property does not require that an indictment alleging harm to intangible rights should be dismissed.

The Court is convinced from its review of the cases that the indictment alleges a scheme to defraud within the meaning of the mail fraud statute.

C. *Sufficiency of the Indictment*

The defendants also challenge the sufficiency of the indictment under *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620 (1974), where the Supreme Court noted:

[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

The questions presented by the defendants are whether the elements of the offense of mail fraud are set out in the indictment, and if so, whether they are set out in specific enough detail to give them fair notice of the charges against them, and to preclude future prosecutions for the same offense.

From the discussion in Part IB of this Memorandum, it should be clear that the indictment does allege a "scheme to defraud", which is one of the elements of the offense of mail fraud. The other element, a use of the mails in furtherance of the scheme to defraud, is clearly alleged and set out in Counts one through twenty.

The major criticism leveled by the defendants is that the indictment sets out the "scheme to defraud" in such a vague and indefinite manner that it fails to give them fair notice of the charges and to afford them double jeopardy protection. The defendants point to Rule 7 of the Federal Rules of Criminal Procedure, which states that an indictment should contain a "plain, concise and definite written statement of the essential facts constituting the offense charged" and Form 3 in the Appendix of Forms to those Rules, as setting forth the proper standards of specificity.

It is, of course, not necessary that an indictment set forth detailed evidential facts. *United States v. Curtis*, 506 F.2d 985, 989 (10th Cir. 1974), and cases cited therein. It has also been held that since the gist of the offense of mail fraud is the use of the mails, the "scheme to defraud" need not be set forth with the same precision as the use of the mails. *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D. Fla.1962); *Leche v. United States*, 118 F.2d 246, 247 (5th Cir. 1941), *cert. denied*, 314 U.S. 617, 62 S.Ct. 73, 86 L.Ed. 496, *reh. denied*, 314 U.S. 712, 62 S.Ct. 295, 86 L.Ed. 567 (1941). But the scheme to defraud must be set out with sufficient specificity to ensure fair notice and double jeopardy protection. The nature of the scheme cannot be left so much to speculation that a prosecutor could proceed at trial to demonstrate a scheme essentially different from that relied upon by the government before the Grand Jury. *United States v. Curtis, supra; Russell v. United States*, 369 U.S. 749,

767–68, 82 S.Ct. 1038, 1049, 8 L.Ed.2d 240, 252–53 (1962).

██ The Court has carefully considered the arguments made and the cases cited by the defendants, but it is of the opinion that the indictment sets out in sufficient detail the nature of the scheme to defraud so as to inform the defendants of the charges against which they must defend and to prevent future prosecution for the same offense. The indictment conforms to the degree of specificity required by Rule 7 and is in substantial conformity with Form 3. Paragraphs 15 through 32 of Count One of the indictment sufficiently set out the false and fraudulent representations relied upon and sufficiently identify the victims of the scheme to defraud—the citizens and the governmental bodies of the state of Maryland.

██ While a bill of particulars cannot remedy an invalid indictment, *Russell v. United States, supra,* at 770, 82 S.Ct. at 1050–51, 8 L.Ed.2d at 254–55, where an indictment adequately states an offense but fails to give the defendant sufficient notice to avoid surprise at trial, a court, in its discretion, may order a bill of particulars to supplement the indictment. *United States v. Addonizio,* 451 F.2d 49, 64 (3d Cir. 1972); *United States v. Anderson,* 368 F.Supp. 1253, 1263–64 (D.Md.1973). Whatever doubts the Court entertained about the vagueness of certain phrases in the indictment was resolved in the defendants' favor when the Court ordered the government to provide a bill of particulars on March 11, 1976. The Court is of the opinion that the indictment, particularly when supplemented by the particulars and in light of the extensive pretrial discovery in this case, sufficiently gives notice of the charges so as to prevent surprise at trial and affords defendants double jeopardy protection. *See, e.g., United States v. Missler,* 414 F.2d 1293, 1297 (4th Cir. 1969); *United States v. Chunn,* 347 F.2d 717, 720 (4th Cir. 1965).

██ Defendant Cory has raised two additional issues relating to the foregoing discussion. Defendant Cory argues that the allegations of the indictment are insuffi-

cient to charge him with a violation of the mail fraud statute. As an alternative to dismissal of the indictment as to him on this ground, Defendant Cory urges that the indictment should be dismissed as to him for "prejudicial misjoinder". While Defendant Cory's participation in the alleged scheme appears to be less than that of other defendants, if he was a willful party to the scheme to defraud, as he is alleged to have been, he may be convicted for a mail fraud violation. *United States v. Wilson,* 506 F.2d 1252, 1257 (7th Cir. 1974). The fact that the acts with which defendant Cory has been charged are not, in and of themselves, illegal as a matter of state law, is not determinative of whether those acts may constitute part of a scheme which is fraudulent in its totality and in violation of the mail fraud statute. *See* discussion at p. 1007, *supra.*

██ Defendant Cory's second suggestion that the indictment should be dismissed for "prejudicial misjoinder" is inappropriate. Relief from prejudicial misjoinder is severance, not dismissal of the indictment. Rule 14, Federal Rules of Criminal Procedure. Defendant Cory has moved for severance, and his claim of misjoinder will be considered at a later time with other motions.

D. *The claim that application of the Seventh Circuit cases to this case would operate as an ex post facto law in violation of the Constitution*

██ Defendants also argue that the application of the mail fraud statute to the facts charged in this indictment would constitute, in effect, an *ex post facto* application of the construction of the statute "first offered" in 1974 by the Seventh Circuit in *United States v. Isaacs, supra,* and reaffirmed in a number of other recent Seventh Circuit cases, including *United States v. Barrett, supra; United States v. Keane, supra,* and *United States v. Rauhoff, supra.* Where a judicial construction of a statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue", application of that

construction to acts done prior to that time would constitute an *ex post facto* application, and retroactive application would be barred. *Bouie v. City of Columbia,* 378 U.S. 347, 354, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894, 900 (1964). While defendants have sought to so characterize the application of the mail fraud statute to the facts in *Isaacs,* the Court is of the opinion, based on the review of the cases set out in Part IB of this memorandum, that the Seventh Circuit's construction of the statute is correct and in line with principles announced in numerous mail fraud cases decided throughout the statute's history. The Court is aware of no authority, either past or present, which is contrary to the construction of the mail fraud statute given in *Isaacs.* It cannot be said, in light of the principles long settled in mail fraud cases and relied upon in *Isaacs,* that the defendants could not have been aware of their conduct's coming within the statute's proscriptions.

E. *The mailings alleged in the indictment were made after the termination of the scheme to defraud*

The defendants contend that the majority of mailings alleged to have been made in execution of the scheme contained in Counts one through twenty appear, on their face, to have occurred after the termination of the scheme. Defendant Mandel argues that the indictment charges that the final receipt of money envisioned by the alleged scheme was received by defendant Mandel no later than January 1, 1972, and that all mailings thereafter could not therefore be in execution of the scheme, citing *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The Court notes that the indictment alleges that defendant Mandel continued to receive payments as a consequence of his interest in Security until June, 1973. The Court further notes that the allegations in the indictment indicate that a part of the scheme was the concealment of the alleged bribes, and that mailings in furtherance of that concealment, under such circumstances, could be part of the scheme itself or could constitute a "lull-

ing letter" exception. *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).

 In any event, defendants' argument in this respect is simply premature. Whether or not such mailings were in execution of the scheme depends on their relationship to the scheme, which will turn on evidence to be introduced at trial. The government has alleged that all of the mailings were in furtherance of a scheme to defraud, and they should be given the opportunity to prove that allegation at trial. *United States v. Hoffa, supra,* at 716. Whether they will be able to do so is of course a different matter; if at the end of the government's evidence, there is inadequate evidence to support any of the mailings, the Court will of course entertain a motion to dismiss these counts on that basis.

## II. THE RACKETEERING ACTIVITY COUNTS

### A. *The Indictment*

Counts 21 through 24 of the indictment charge various defendants with engaging in patterns of racketeering activity prohibited by 18 U.S.C. § 1961 *et seq.* Section 1962 provides in relevant part,

(b) It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity.

"Racketeering activity", insofar as is here relevant, is defined in § 1961 as including "any act of or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year" and "any act which is indictable under . . . title 18,

United States Code, . . . section 1341 (relating to mail fraud)."

Count 21 charges that defendant Mandel "acquired and maintained an interest in" Security, which is alleged to be an enterprise within the meaning of the statute, "through a pattern of racketeering activity" including the preceding twenty counts of mail fraud and two violations of the Maryland bribery statute, Art. 27, § 23 Maryland Annotated Code. Defendant Mandel is charged in Count 22 with conducting and participating in the affairs of the State of Maryland, which is alleged to be an enterprise within the meaning of the statute, through the same pattern of racketeering activity. Count 23 charges defendants Hess, William A. and Harry W. Rodgers with conducting and participating in the conduct of the affairs of Security through the same pattern of racketeering activity. Defendants Hess, Harry W. and William A. Rodgers, Kovens and Cory are named in Count 24 as violating the statute for conducting and participating in the conduct of the affairs of Marlboro through a pattern of racketeering activity, i.e., the twenty counts of mail fraud.

**B.** *Does the racketeering statute apply only to members of organized crime?*

The defendants argue that Congress intended the statute to apply only to situations where members of organized crime attempt through criminal methods to obtain and subvert interests in legitimate business organizations. There being no allegation in the indictment that the defendants are in any way connected with "organized crime", the defendants suggest that the four counts should be dismissed.

It is undisputed that Congress' primary concern in enacting Title IX of the Organized Crime Act of 1970 was to curb the threatening activities of members of organized crime. *See, e.g.,* Congressional Statement of Findings and Purpose, § 1 of Act Oct. 15, 1970, P.L. 91–452, Title IX, § 901, 84 Stat. 941. But the question made relevant by defendants' argument is whether Congress intended the statute to apply *exclusively* to members of organized crime.

Congress' principal concern in enacting Title IX of the Organized Crime Control Act was to provide prosecutors with an *effective* tool in combatting organized crime. In doing so, Congress clearly expressed its frustration over the failure of traditional criminal statutes to curtail the activities of organized crime. *See, e.g.* S.Rep. No. 91–617, 91st Cong., 1st Sess. 78–79 (1969). Congress hoped that the civil provisions of the statute, patterned on the anti-trust remedies of forfeiture and divestment, would be more successful than the criminal approach in which the government had a higher burden of proof and the defendant was cloaked with extensive procedural and substantive rights.

These concerns are relevant here because they make it highly unlikely that Congress, in enacting the criminal provisions of the statute, intended to make a conviction under the statute turn on a showing that the defendant was in some way a member of "organized crime". To require proof beyond a reasonable doubt that a defendant was a member of "organized crime", with the highly subjective and prejudicial connotations of that term, would simply render the statute unenforceable, a result plainly not in the contemplation of Congress.

Indeed, the legislative history of Title IX shows that Congress had taken pains to make a conviction dependent upon behavior, and not "status". When faced with various proposals to incorporate a definition of organized crime, Congress flatly rejected the attempt, aware of the impossibility of definition. 116 Cong.Rec., part 26, Oct. 7, 1970, p. 35344. When asked during the debate on the bill in the House of Representatives whether the bill contained a definition of organized crime, Representative Celler replied,

No; there is no such definition. That particular matter was left flexible so that there would be no difficulty in enabling the Attorney General to attack this very horrendous evil that besets our Nation.

116 Cong.Rec., Oct. 7, 1970, p. 35302. Furthermore, the fact that Congress passed the bill without such a definition, in face of serious criticisms that the lack of a definition would render the statute subject to abuse and application to areas "far removed from . . . organized crime"[6], supports the conclusion that Congress did not intend that some connection with organized crime be demonstrated to convict a criminal defendant.

Rather than attempt to define "organized crime" and make membership therein unlawful, a task which would undoubtedly have been impossible and probably unconstitutional, Congress defined an unlawful pattern of racketeering activity in terms of the types of crimes and behavior commonly engaged in by organized crime in attempts to seize interests in legitimate businesses. In so defining the offense, Congress clearly understood that while the statute would apply primarily to members of organized crime, the statute could not be applied exclusively to members of organized crime. As then Assistant Attorney General Will Wilson noted:

> Seldom, if ever, would one expect to be able to draft an acceptable provision which would apply *exclusively* to the Syndicate. Certainly no provision in S. 30 purports to be so narrowly limited.

Wilson, "The Threat of Organized Crime", 46 Notre Dame Lawyer 41, 48 (1970), (emphasis in original).

■■■ The activities charged in the indictment here fall plainly within the definition of "racketeering activity". As the Fourth Circuit noted recently in the context of another statute,

> [W]e do not believe that it is normally a proper judicial function to try to cabin in the plain language of a statute, even a criminal statute, by limiting its coverage to the *primary* activity Congress had in mind when it acted.

*United States v. LeFaivre*, 507 F.2d 1288, 1295 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975) (emphasis in original). *See also United States v. Roselli*, 432 F.2d 879 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). For these reasons, the Court holds that the absence of any allegation that these defendants are in any way connected with "organized crime" does not require a dismissal of the charges brought under 18 U.S.C. § 1961 et seq. *Accord., United States v. Campanale*, 518 F.2d 352, 363–64 (9th Cir. 1975), *cert. denied sub. nom. Grancich v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). A contrary conclusion was reached recently in a case brought by a private party under the civil provisions of § 1964. *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109 (S.D.N.Y. 1975). That court did not consider the difficulties in alleging and proving an association with "organized crime", nor did it consider the legislative history indicating that Congress did not intend the Act to apply exclusively to members of organized crime. With deference to the decision in that case, this Court is unable to conclude that the analysis in *Barr* should be applied here, in a criminal prosecution, where a requirement for the government to demonstrate a connection between the defendant and "organized crime" would render the statute unenforceable.

C. *The meaning of "through" in § 1962(b)*

■■■ Defendant Mandel also proffers the argument that the word "through" appearing in § 1962(b) should be interpreted so as to require a showing that the acquisition or maintenance of an interest in an enterprise was directly caused by, rather than merely associated with, the racketeering activity alleged. More specifically, with respect to count 21, defendant Mandel urges that only those mailings which directly caused his alleged acquisition of an interest in Security can support a prosecution under § 1962,

---

**6.** *See, e.g.*, Hearings on S. 30 and Other Measures Relating to Organized Crime Before the Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary, 91st Cong., 1st Sess. (1969) (remarks of American Civil Liberties Union); H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., (1970), reprinted in 2 U.S.Code Cong. & Admin.News, 4007, 4083 (dissenting views of Reps. Conyers, Mikva, and Ryan).

and that the other mailings allegedly made as a part of the scheme to defraud which themselves have nothing to do with Security, cannot constitute "racketeering acts". In essence defendant Mandel is urging the Court to adopt a "proximate cause" test, so that only those "racketeering acts" which proximately resulted in the acquisition or maintenance of an interest in an enterprise can be alleged to be part of the "prohibited pattern." To so narrow the meaning of the word "through" would be to reward subtle and sophisticated patterns of racketeering activity in which it would be difficult, if not impossible, to identify the "proximate cause" of an acquisition of an interest in an enterprise. Furthermore, while the interpretation suggested may make sense for the "acquisition" of an interest, which is an event theoretically susceptible of location in time and to which causal events might easily be attached, it makes little sense for the "maintenance" of an interest, which would occur over time and be the product of many causal factors. To adopt the interpretation urged here would unnecessarily frustrate Congress' intention to rid the influence of racketeering activities from legitimate businesses.

## D. Is the State of Maryland an "enterprise"?

Defendant Mandel also urges that Count 22 be dismissed on the ground that the State of Maryland is not an enterprise within the meaning of the statute. "Enterprise" is defined in § 1961(4) as including an "individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The question presented by defendant Mandel is whether the State of Maryland falls within that definition, or whether that definition is limited to private entities.

The government contends that a state falls plainly within the definition of "enterprise", as it is a "legal entity" and possibly even a political "corporation". Courts, however, are hesitant to construe such expansive and undefined terms as "any legal entity" and "any group of individuals associated in fact although not a legal entity", to the broad limits that the words taken by themselves might suggest, particularly where they follow words of a much more precise and narrow application. Rather, it is a court's duty to review legislative history for the purpose of ascertaining Congress' meaning in the use of these terms. Such a course is particularly preferable where the statute, such as the one here, is criminal.

The legislative history of Title IX of the organized Crime Control Act contains no express consideration of the question whether an "enterprise" may include such public entities as governments and states. It would be difficult to infer from this legislative silence any authority to construe the statute broadly so as to include public entities. Furthermore, to read the word "enterprise" as including public entities would do violence to the plain purposes of Title IX. The legislative history is full of references to the major purpose of Title IX: to rid racketeering influences from the commercial life of the nation. See, e.g. H.Rep.R. No. 91–1549, 91st Cong. 2nd Sess., 106–107 (statement by Sen. McClellan, one of the authors of the bill). In its research into the extent of infiltration of organized crime into the business life of the nation, Congress heard testimony and reports of infiltration into a startling variety of industries, unions, service organizations, and the like—but nothing was said about governments. The validity of the civil provisions of the act clearly depends on a finding that the purpose of Title IX of the Organized Crime Control Act is a remedial one, concerned with ending the monopolistic influences on the free market system caused by the violent and criminal tactics used by organized crime in taking over interests in legitimate businesses. See United States v. Cappetto, 502 F.2d 1351, 1357 (7th Cir. 1974). Nothing in the legislative history indicates any concern over the use of such tactics in the subversion of states or governments.

The remedies provided for in the civil and criminal provisions clearly imply that Congress had only private entities in minds when defining "enterprise". The criminal penalties include fine, imprisonment and forfeiture; the civil penalties, modeled on the antitrust statute, provide for private treble damage actions and such injunctive relief as divestiture and forfeiture. It could hardly be contended that a private citizen of a state, aggrieved by the "racketeering acts" of an official in conducting the state, could bring a treble damage action against that official and require forfeiture of office and dissolution of the state government. The interpretation of this statute to include "states" within the meaning of "enterprise" would clearly result in what could only be characterized as a startling departure from the traditional understanding of federal-state relationships. Unless Congress has clearly indicated its intentions to "alter sensitive federal-state relationships", courts should be reluctant to give ambiguous phrases within a statute that effect. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059–60, 28 L.Ed.2d 493, 496–97 (1971).

Further, at least part of Congress' concern in enacting Title IX of the Organized Crime Control Act was to enable the relatively small businessman operating in interstate commerce, who was most in need of protection from the criminal tactics of an interstate network of racketeers, to invoke the protection of the federal laws. But governments and states do not stand in the same position as the small businessman when it comes to fighting infiltration by organized crime or protecting themselves against racketeering acts. States have their own adequate resources to combat threats to their integrity leveled by organized crime; states have laws regulating the behavior of public officials that are adequate to protect a state from any racketeering acts engaged in by that official. It is simply untenable to argue that Congress, without saying so, intended to federalize

crimes involving the acts of a public official in conducting the government of a state. In the absence of clear Congressional intent, courts traditionally should be reluctant to give a broad construction to a criminal statute which would transform matters primarily of local concern into federal felonies.

The Court is further supported in this conclusion by the well-established rule of statutory interpretation, the doctrine of *ejusdem generis*, i.e., the presumption that all items named are of the same type and class. As the Fifth Circuit recently noted in a similar context,

In divining legislative intent, however, a venerable precept of statutory construction, the doctrine of *ejusdem generis*, warns against expansively interpreting broad language which immediately follows narrow and specific terms. To the contrary, the maxim of statutory analysis counsels courts to construe the broad in light of the narrow, in a commonsense recognition that general and specific words, when present together, are associated with and take color from each other.

[citations omitted]

*United States v. Insco*, 496 F.2d 204, 206 (1974). None of the specific narrow nouns involved in this definition are public entities. They are rather a listing of the common legal forms in which business entities and labor groups fashion themselves to carry out their private functions. The more general references to "any legal entity" and "any group of persons associated in fact although not a legal entity" must be construed to be limited to the same type and class of entities which preceded it in the statutory definition. *See United States v. Moeller*, 402 F.Supp. 49, 58, 61 (D.Conn. 1975).

In holding that "enterprises" within the meaning of the statute are limited to private entities, the Court is compelled to disagree with the recent contrary holding in *United States v. Frumento*, 405 F.Supp. 23, 29–30 (E.D.Pa.1975).[7] That case held that

---

7. The government has also informed the Court that convictions under the racketeering act have been reported in *United States v. Seymour, et al.*, No. 75–27–MAC (M.D.Ga.1975), in which the Police Department of the City of Macon was alleged to be an "enterprise" within the meaning of the statute. Those convictions are now pending on appeal to the Fifth Circuit.

the Bureau of Cigarette and Beverage Taxes, in the Pennsylvania Department of Revenue, was an "enterprise" within the meaning of the Act. The Court, without aid of briefs filed by counsel (*see* 405 F.Supp. at 29, note 1), based its holding on the fact that Congress had instructed that the provisions of the Act should be "liberally construed to effectuate its remedial purposes." Pub.L.No. 91–452, § 904(a). What the Court failed to note is that the Act, with its civil and criminal provisions, has both punitive *and* remedial purposes. While Congress may instruct courts to give broad interpretations to civil provisions, it cannot require courts to abandon the traditional canon of interpretation that ambiguities in criminal statutes are to be construed in favor of leniency. *Rewis v. United States, supra; Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). To do so would be to violate the principles of due process on which the canon of interpretation rests. The Court in *Frumento* also relied on an isolated comment made by Sen. McClellan in Congress that the Act was also concerned with the corruption of "the processes of our democratic society." 405 F.Supp. at 30. That comment, however, was made in the context of an introductory discussion of all eleven titles of the Organized Crime Control Act, and not to the specific provisions and remedies of Title IX which are involved here. That comment cannot therefore stand as authority for the proposition that "enterprise" includes states and governments. The Court is unable to accept the analysis in *Frumento*, and respectfully disagrees with the decision in that case.

This holding does not, as the government contends, provide some immunity from prosecution to a public official that would be unavailable to a private party. As the Court has previously noted, whoever engages in prohibited patterns of racketeering activities comes within the purview of the statute, including public officials. All that the Court holds is that a state is not an enterprise within the mean-

ing of the statute, and that therefore, engaging in patterns of racketeering activities in the conduct of the administration of a state government is not punishable by *this* statute.

Since the state of Maryland is not an "enterprise" within the meaning of the racketeering statute, Count 22 must be dismissed.

### E. The claim that the statute, if applied, would operate as an ex post facto law

Defendants have also raised the argument that Count 24 should be dismissed on the grounds that as applied to the facts alleged in the indictment, the statute would operate as an *ex post facto* law in violation of the Constitution. It is, however, clear from the indictment that a number of acts alleged to be "racketeering activities" occurred after the effective date of the statute on October 15, 1970. Congress specifically considered the problem of *ex post facto* application by requiring that at least one racketeering act occur after the effective date of the statute, so as to put those who had committed racketeering acts prior to that date on notice that one more act would trigger the penalties of the section. The constitutionality of the provision has been recently upheld. *United States v. Campanale*, 518 F.2d 352, 364–65 (9th Cir. 1975), *cert. denied sub. nom. Grancich v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

## III. FEDERAL/STATE CONSIDERATIONS & LEGISLATIVE IMMUNITY

The defendants strongly urge as a ground for dismissal that this prosecution is an unwarranted intrusion of the federal executive power into the affairs of a sovereign state's executive and legislative branches; that it does violence to principles of federalism; and that the Governor functions as a legislator to the extent that he participates in the legislative process and has the privilege of legislative immunity in this prosecution.

■ To the degree that defendants are suggesting that the Court should dismiss the indictment on general "abstention" grounds, on the premise that the matters charged in the indictment are matters which are predominantly of local concern with which federal courts and prosecutors should not be involved, the Court would disagree. The crimes charged here are federal ones, with important federal interests at stake. The mail fraud statute reaches all schemes to defraud, including those not punishable under state law, when the United States mail is used in execution of the scheme. The indictment in this case alleges twenty mailings, each a violation of the mail fraud statute. Similarly, the statute prohibiting patterns of racketeering activity involves significant federal interests; Congress has made it a federal crime to engage in certain patterns of behavior which it found to be inimical to the free enterprise system. The indictment here alleges that defendants engaged in mail fraud and bribery with regard to two businesses involved in interstate commerce. The Court sees no reason to dismiss the indictment on general grounds of abstention.

The defendants also argue that the indictment should be dismissed for the reason that the prosecution under the mail fraud statute seeks to impose duties upon the office of the Governor which are inconsistent with those established by the Constitution of the State of Maryland. The contention is that the mail fraud prosecution is premised upon an affirmative "duty to disclose" certain matters to the legislature, whereas, as a matter of Maryland constitutional law, the Governor has unfettered discretion in choosing what to disclose or not disclose to the legislature. The defendants argue that the Maryland Constitution forbids the imposition of additional duties on the office of any constitutionally elected officer, and that the imposition of such a duty as a consequence of a general federal criminal law would violate the Constitution of the United States.

The defendants' argument boils down to the assertion that federal law cannot declare criminal those acts which a governor takes with respect to a state legislature, which acts are, as a matter of state law, within the governor's discretion to do. The argument contains a number of dubious propositions.

■ First and foremost is the assumption that Maryland law declares the acts alleged in the indictment to be within the Governor's discretion to make. The constitutional provisions on which the defendants rest their argument provides only that the Governor:

> shall, from time to time, inform the Legislature of the condition of the State and recommend to their consideration such measures as he may judge necessary and expedient.

Art. II, Section 19, Maryland Constitution. The obvious import of this section is that the Governor may recommend such legislation for the General Assembly's consideration as he might determine in his discretion is in the public interest. It is hardly the blanket grant of unfettered discretion that defendants have argued that it is. It does not purport to exhaust the duties of the office of Governor vis-a-vis the General Assembly, nor could it possibly be concerned with such actions as fraudulent representations and concealment of bribes and conflicts of interest, such as are alleged in the indictment.

■ Secondly, the government alleges that the indictment rests not upon some passive failure of the governor to comply with an affirmative duty to disclose, but rather upon active and deceitful concealment and misrepresentations. As such, it does not seem that the indictment imposes any duties upon the office of Governor that are not already there as a consequence of state law, for it could scarcely be contended the law of Maryland would allow the Governor to accept bribes and fraudulently conceal them.

■ Thirdly, even if there were some conflict with the federal law, it would seem

a doubtful proposition that state law can operate to render someone immune from prosecution for a federal crime by declaring the underlying criminal activity lawful by virtue of the accused's status as a public official. In this connection, it is of interest to note that the Maryland Constitution recognizes federal law as the supreme law of Maryland, and that all persons in Maryland are bound thereby, nothing in the Maryland laws or Constitution notwithstanding. Article 2, Declaration of Rights, Maryland Constitution.

 Finally, even if there is in some way a conflict, this prosecution, while it would perhaps strain federal-state relationships, would not violate Article 4, § 4 of the United States Constitution, as contended by defendants. All that Article 4, § 4 stands for is the principle that the Constitution does not impose any particular form of republican government on the states. That would hardly require that state officials be exempted from the operation of federal criminal law.

 Defendant Mandel has proposed that the doctrine of legislative immunity should bar the prosecution of this case. He argues that the Speech or Debate privilege in the United States Constitution is applicable to the states; that the Governor, in vetoing bills or recommending legislation, participates in the legislative process; and that, insofar as the governor does so participate, he is a legislator for the purposes of legislative immunity.

The Court need not at this point go into an extensive discussion of the points raised by defendant Mandel and the government as it is of the opinion that the argument is prematurely raised. While the indictment does refer to defendant Mandel's intent to aid and assist certain legislative matters favorable to the business interests of the other defendants, it does not appear with certainty that this prosecution depends upon any inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts. *United States v. Brewster,* 408 U.S. 501, 525, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507, 525 (1972);

*United States v. Dowdy,* 479 F.2d 213 (4th Cir. 1973). As in the *Brewster* case, this case involves conduct which is outside the scope of legislative acts; it concerns allegations of bribery, mail fraud, and prohibited patterns of racketeering activity. The fact that a bribe was received in return for a promise to do a legislative act does not require any inquiry into or proof of that legislative act. Nor would acts of concealment, fraudulent misrepresentations, and the awarding of state contracts, all of which are parts of the scheme to defraud, seem to have any reference to legislative acts. Thus, even if defendant Mandel is entitled to assert a legislative privilege—a point on which the Court does not now express an opinion—it is evident that the indictment need not be dismissed. The Court will consider the question when and if inquiry into legislative acts becomes an evidentiary matter. At that time, the Court and all parties will have a better opportunity to examine the arguments here raised in the context of the trial.

### ORDER

For the reasons set forth in the foregoing Memorandum, it is this 23rd day of March, 1976, by the United States District Court for the District of Maryland,

*ORDERED:*

(1) that the motion of defendant Mandel to dismiss the indictment, the motion of defendants Hess, William A. and Harry W. Rodgers to dismiss the indictment, the motion of defendant Cory to dismiss Count 24, the motion of defendant Cory to dismiss the indictment, and the motion of defendant Kovens to dismiss the indictment, be, and the same hereby are *DENIED*, except that they are *GRANTED* as to Count 22;

(2) that Count 22 be, and the same hereby is, *DISMISSED*;

(3) that the motion of defendant Mandel to certify questions of law to the Maryland Court of Appeals, the motion of defendants Hess, William A. and Harry W. Rodgers to certify questions of law to the Maryland Court of Appeals be, and the same hereby are, *DENIED*;

(4) that the motion of defendant Mandel to strike certain portions of the indictment, and the motion of defendants Hess, William A. and Harry W. Rodgers to strike portions of the indictment be, and the same hereby are *DENIED*, except that they are *GRANTED* to the extent of striking all references to the Code of Ethics;

(5) that paragraph 12 of Count One in its entirety, and the phrase of the indictment at paragraph 13(b), Count One, stating "and Code of Ethics", be, and the same hereby are, *STRICKEN*.