**UNITED STATES of America**

v.

**J. Richard BARBER.**

**Crim. A. No. 79–20038.**

United States District Court,
S. D. West Virginia,
Charleston Division.

Aug. 22, 1979.

Robert B. King, U. S. Atty., Wayne A. Rich, Jr., Rebecca A. Betts, Asst. U. S. Attys., Charleston, W. Va., for plaintiff.

Rudolph L. DiTrapano, Timothy N. Barber, Charleston, W. Va., for defendant.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This criminal action is before the court on the defendant's motion to dismiss the first count of the within indictment. Count One charges the defendant with one violation of Title 18, United States Code, Section 1962(c). Section 1962(c) is contained in Title IX of the Organized Crime Control Act of 1970 (hereinafter, the "Act"). Title IX is entitled "Racketeer Influenced and Corrupt Organizations" (hereinafter, "RICO").

Section 1962(c) states:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Defendant was at all material times Alcohol Beverage Control Commissioner for the State of West Virginia (hereinafter, "ABCC"). The ABCC is authorized by state law to supervise and control the wholesale and retail distribution of alcoholic beverages in West Virginia. W.Va.Code § 60–3–1 (1977). Count One alleges that the operation of the ABCC affects interstate commerce, and that the defendant, as commissioner, conducted the affairs of the ABCC through a pattern of racketeering activity, as is more fully described in the indictment.

Defendant contends that a state agency or other governmental body does not constitute an enterprise as required by section 1962(c).[1] Defendant relies primarily on *United States v. Mandel,* 415 F.Supp. 997

(D.Md.1976), *aff'd in part, remanded in part,* 591 F.2d 1347 (4th Cir. 1979), *district court aff'd on rehearing,* 602 F.2d 653 (July 20, 1979) (en banc), as well as the legislative history of RICO and the Act.

The court necessarily begins with the language of the statute. The term enterprise is expressly defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The statutory definition thus stretches from the specific to the broad, general term "other legal entity," to the even greater informality of persons merely associated in fact.

The ABCC is a legal entity, and consequently comes within the literal meaning of enterprise. Established by section 60–2–1 of the West Virginia Code, the ABCC has authority to enter into contracts for the leasing of buildings and the purchase of equipment, to employ personnel, and to otherwise carry out the duties attendant to the purchase, sale, and distribution of alcoholic beverages. *See* W.Va.Code §§ 60–2–11, 60–2–12 (1977).

It is arguable that the more specific language "any individual, partnership, corporation, association" in section 1961(4) limits the meaning of the subsequent term "other legal entity" through application of the doctrine of *ejusdem generis.* Whether or not it is appropriate to utilize *ejusdem generis* here to circumscribe the otherwise broad definition in the statute requires an analysis of the congressional purpose.

The Statement of Findings and Purpose in the Organized Crime Control Act summarizes the breadth of the problem of organized crime, and the intense congressional concern to combat it:

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread

---

1. Defendant also argues in his motion to dismiss Count One that the RICO statute is unconstitutional for a number of reasons. Those alleged constitutional infirmities have been heretofore rejected by the court on the record of prior proceedings in the case.

activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Pub.L. No. 91–452, § 1, 84 Stat. 922.

Recurrent themes running throughout the legislative history include the diversity of organized crime, its penetration into virtually every phase of the nation's economic and political life, the infiltration of, and dependency upon, political institutions by persons engaged in organized crime, and the ineffectiveness of past enforcement efforts. Senator Hruska of Nebraska, a member of the Subcommittee on Criminal Laws and Procedures which drafted and introduced the bill, made the following comments during the initial Senate debates:

In recent years, organized crime has become increasingly diversified and has become entrenched in legitimate businesses and in labor unions where it employs terrorism, extortion, tax evasion, bankruptcy fraud and manipulation, and other measures to drive out lawful owners and officials. Also, wherever organized crime exists, it corrupts public officials and wields extensive political influence which insulate its activities from governmental interferences.

Corrupt officials and bribed law enforcement officers operate as "a silent conspiracy" in support of organized crime. The syndicate could not continue to operate without corrupt judges and prosecutors, or without the assistance of a handful of bribed police.

116 *Cong.Rec.* 601 (1970). Senator Byrd of West Virginia echoed the concern expressed by his colleague:

A study for the President's Crime Commission, still secret, reportedly details the infiltration of organized crime into local, State and Federal Government, including, it is said, the control of several Federal district judges.

These recent revelations are simply a further indication that we are suffering from a bad case of moral rot and that we are allowing our cherished democratic institutions to crumble before our eyes. I hope the revelations will serve to shock some of our more complacent citizens into an awareness of the magnitude of the problem.

*Id.* at 606. The House debates contain similar comments:

The danger of organized crime arises because the vast profits acquired from the sale of illicit goods and services are being invested in licit enterprises, in both the economic sphere and the political sphere. It is when criminal syndicates

start to undermine basic economic and political traditions and institutions that the real trouble begins. And the real trouble has begun in the United States. *Id.* at 35199 (remarks of Rep. St. Germain).

Congress responded to this unanimous sense of urgency by enacting a comprehensive scheme incorporated in twelve separate titles. The first ten titles were capsulized by Senator McClellan, chairman of the Subcommittee on Criminal Laws and Procedures, during his presentation of the bill to the Senate:

> Mr. President, the product of this process is a bill which has been carefully drafted to cure a number of debilitating defects in the evidence-gathering process in organized crime investigations [Titles I–VI], to circumscribe defense abuse of pretrial proceedings [Title VII], to broaden Federal jurisdiction over syndicated gambling and its corruption where interstate commerce is affected [Title VIII], to attack and to mitigate the effects of racketeer infiltration of legitimate organizations affecting interstate commerce [Title IX], and to make possible extended terms of incarceration for the dangerous offenders who prey on our society [Title X].

*Id.* at 585.[2]

The legislative history thus illustrates the broad congressional perspective and sweeping determinism from which Title IX originated.

It is equally clear that at the time the Act was being considered by each house of Congress, the legislative target was the organized criminal syndicate. The Act does not, however, define "organized crime." Moreover, the following titles in the Act are applicable to any criminal proceeding without limitation or reference to traditional notions of organized crime: Title II, providing a procedure whereby the government may request court-ordered use immunity for a witness, 18 U.S.C. § 6001, *et seq.;* Title III, permitting the court to incarcer-

ate a witness who refuses to comply with a subpoena or other court order, 28 U.S.C. § 1826; Title IV, prohibiting false declarations before a grand jury or court, 18 U.S.C. § 1623; Title VII, restricting hearing and disclosure requirements in instances where a defendant alleges unlawful electronic surveillance, 18 U.S.C. § 3504; Title VIII, prohibiting illegal gambling, 18 U.S.C. § 1955; Title IX, prohibiting racketeering activity and providing criminal and civil proceedings and remedies to eliminate it, 18 U.S.C. §§ 1961–68; Title X, providing increased sentences for "dangerous special offenders," 18 U.S.C. §§ 3575–78; and Title XI, regulating the manufacture and distribution of certain materials classified as explosive, 18 U.S.C. §§ 841–48.

Congress was aware that the application of these various legislative proposals extended beyond syndicated crime. Attempts to include a definition of "organized crime" or otherwise confine the Act to its genesis were however specifically rejected. In response to the challenge that the bill was overreaching, Rep. Poff, a member of the House Judiciary Committee which considered and reported the proposed Act, made the following comment:

> The gentleman [Rep. Mikva] inquired rhetorically as to why no effort was made to define organized crime in this bill. It is true that there is no organized crime definition in many parts of the bill. This is, in part, because it is probably impossible precisely and definitively to define organized crime. But if it were possible, I ask my friend, would he not be the first to object that in criminal law we establish procedures which would be applicable only to a certain type of defendant? Would he not be the first to object to such a system?

116 *Cong.Rec.* 35204 (1970). At a later point in the debates, Rep. Poff elaborated upon the Committee's position:

> The curious objection has been raised to S. 30 [the proposed Act] as a whole,

**2.** Title XI, "Regulation of Explosives," and Title XII, "National Commission on Individual Rights," were added by the House Committee on the Judiciary to the original Senate bill. 1970 *U.S.Code Cong. & Admin.News* p. 4007.

and to several of its provisions in particular, that they are not somehow limited to organized crime—as if organized crime were a precise and operative legal concept, like murder, rape, or robbery. Actually, of course, it is a functional or sociological concept like white collar or street crime, serving simply as a shorthand method of referring to a large and varying group of individual criminal offenses committed in diverse circumstances.

Nevertheless, this line of analysis has a certain superficial plausibility. But if we make a closer examination we see that it is seriously defective in several regards. Initially, it confuses the occasion for re-examining an aspect of our system of criminal justice with the proper scope of any new lesson derived from that reexamination. For example, our examination of how organized crime figures have achieved immunity from legal accountability led us to examine the sentencing practices and powers of our Federal courts. There we found that now our Federal judges, unlike State judges, have no statutory power to deal with organized crime leaders as habitual offenders and give them extended prison terms. Having noted the lack of habitual offender provisions by considering one class of cases, we obviously learned that it was lacking on other classes, too. Is there any good reason why we should not move to meet that need across the board?

*Id.* at 35344.

These comments, and others in the legislative history not specifically cited, demonstrate two relevant points: first, Congress was focusing its efforts upon certain criminal activity often associated with criminal syndicates, but was not attempting to define or isolate the participants in organized crime, or otherwise restrict the applicability of the Act's provisions. *See United States v. Forsythe*, 560 F.2d 1127, 1135–36 (3d Cir. 1977); *United States v. Mandel*, 415 F.Supp. 997, 1018–19 (D.Md.1976). Second-

ly, Congress undoubtedly perceived the problem as one of magnitude and diversity, and determined to leave as few enforcement gaps as possible where in fact the criminal activity exists, as defined in the Act.

 The court concludes that Congress did not intend to limit the plain meaning of the words "other legal entity" in the statutory definition of enterprise. The doctrine of *ejusdem generis* "is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. . . . [I]t may not be used to defeat the obvious purpose of legislation. And, while penal statutes are narrowly construed, this does not require rejection of that sense of the words which best harmonizes with the context and the end in view." *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936), *quoted in United States v. Alpers*, 338 U.S. 680, 683, 70 S.Ct. 352, 94 L.Ed. 457 (1950). To interpret "other legal entity" to include only organizations similar to those specified in the statutory definition would impermissibly confine the scope of the congressional intent. As noted by the Third Circuit Court of Appeals in *United States v. Frumento*, 563 F.2d 1083 (1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 1258, 55 L.Ed.2d 775, 776 (1978), "Congress intended the general words defining an 'enterprise' in § 1961(4) to go beyond the specific reference to private business or labor organizations." *Id.* at 1090.

Defendant urges, however, that Congress simply did not intend to include state or public entities within the definition of enterprise, citing *United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976). In *Mandel*, the district court held that the State of Maryland was not an enterprise within the meaning of section 1962(c), and accordingly dismissed Count 22 of the indictment. Count 22 charged the defendant Mandel with "conducting and participating in the affairs of the State of Maryland, which is alleged to be an enterprise within the meaning of the statute, through the same

pattern of racketeering activity [alleged in earlier counts]." *Id.* at 1018.[3]

The *Mandel* court, in a well written opinion, found that (1) Title IX's major purpose was to "rid racketeering influences from the commercial life of the nation," as evidenced by the legislative history; (2) governmental entities were never discussed during congressional consideration of Title IX; (3) the civil and criminal remedies in section 1963 were appropriate only for private entities; (4) the policies and concerns underlying Title IX were inapplicable to public bodies; and (5) the doctrine of *ejusdem generis* limited the meaning of enterprise to the kinds of private entities specifically named in the statutory definition. *Id.* at 1020–21. The court thus implied from these findings that Congress did not intend to include governmental or public entities in the definition of enterprise for purposes of section 1962.

The analysis of the *Mandel* court has some force. The legislative history for Title IX is replete with references to businesses and labor unions, and the economic effects of criminal infiltration in various industries. Governmental bodies or agencies were never addressed specifically in the context of Title IX, although Congress repeatedly expressed grave concern over the deterioration of our democratic institutions through the infiltration of organized crime, as is evident from the earlier discussion.

██ Upon careful review of the legislative history of Title IX and an examination of the Act as a whole, it appears inappropriate to interpret Congress' silence as an exception for all public entities. The court hesitates to carve out such a broad exemption where there is no positive basis in the legislative history for so doing, but only a negative inference from the absence of specific congressional consideration. Where Congress did not expressly address an issue, "the court must discern the applicable legislative intent by what is necessarily an act of projection—starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent . . . ." *Montana Power Co. v. Fed. Power Com'n,* 144 U.S.App.D.C. 263, 270, 445 F.2d 739, 746 (D.C.Cir. 1970) (en banc), *cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971), *supp'd* 148 U.S.App.D.C. 74, 459 F.2d 863, *cert. denied,* 408 U.S. 930, 92 S.Ct. 2497, 33 L.Ed.2d 343 (1972). As discussed *supra,* Congress intended through the twelve titles of the Act to strengthen enforcement against certain criminal activity; the fact that a public vehicle is allegedly used to perpetrate that activity should not, it seems, automatically immunize a defendant from RICO sanctions.

The court's reluctance to exempt public entities from Title IX liability is not altered by the criminal and civil remedies provided therein. Section 1963(a) states that:

Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

Section 1964(a) authorizes the district court to enter appropriate orders following civil proceedings instituted by the United States:

---

**3.** On appeal, the government did not assign as error the dismissal of Count 22. 591 F.2d 1347 (1979). The Fourth Circuit Court of Appeals thus did not consider in its review of the *Mandel* case whether a state or public entity may be an enterprise for purposes of a RICO violation.

The court notes parenthetically that the Fourth Circuit upheld the conviction of a police officer charged under section 1962(c) with receiving bribes in return for the protection of illegal night clubs and gambling operations. The enterprise in that case was the police department vice squad for the county of Charleston, South Carolina. *United States v. Burnsed,* 566 F.2d 882 (4th Cir. 1977). However, apparently the defendant in *Burnsed* did not argue the enterprise issue presented in *Mandel,* and raised by the defendant here. The question remains open in this district.

The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

And section 1964(c) provides that any person whose property or business is injured by a violation of section 1962 may seek treble damages for any loss sustained.

The district court in *Mandel* concluded that "the civil and criminal provisions clearly imply that Congress had only private entities in minds [sic] when defining 'enterprise.'" 415 F.Supp. at 1021. The *Mandel* court perceived the remedies as creating impossible and improper results if applied to a state entity:

> The criminal penalties include fine, imprisonment and forfeiture; the civil penalties, modeled on the antitrust statute, provide for private treble damage actions and such injunctive relief as divestiture and forfeiture. It could hardly be contended that a private citizen of a state, aggrieved by the "racketeering acts" of an official in conducting the state, could bring a treble damage action against that official and require forfeiture of office and dissolution of the state government. The interpretation of this statute to include "states" within the meaning of "enterprise" would clearly result in what could only be characterized as a startling departure from the traditional understanding of federal-state relationships. Unless Congress has clearly indicated its intentions to "alter sensitive federal-state relationships", courts should be reluctant

to give ambiguous phrases within a statute that effect.

*Id.*

This court does not share the suggestion in *Mandel* that a private treble damage action against a public official engaged in racketeering activity is inconceivable under RICO. It is apparent however that where a state is the alleged enterprise, as in *Mandel*, dissolution is unthinkable and forfeiture of office impracticable if not constitutionally impermissible. On the other hand, the dissolution and forfeiture provisions, intended as they were to "free the channels of commerce from all illicit activity," S.Rep. No. 91–617, 91st Cong., 1st Sess. 79 (1969), are clearly apropos where private businesses have been criminally infiltrated.

 Irrespective of these distinctions, divestiture and civil forfeiture are discretionary sanctions to be used by the government and the court to fashion adequate remedies. *See United States v. Cappetto*, 502 F.2d 1351, 1359 (7th Cir. 1974). There is no binding correlation between Title IX's remedial options and the question of whether Congress intended to omit public entities from the meaning of enterprise. In fact, this panoply of remedies reinforces the court's conclusion that Congress perceived its target as broad and diverse. The criminal and civil penalties in sections 1963 and 1964 support the undisputed fact that Congress intended to combat takeovers of private businesses through illegal activity. It by no means follows that, had Congress specifically addressed the question, it would have excluded public entities from the substantive provisions of section 1962.

Two circuit courts of appeals have concluded that a public entity may be an enterprise. In *United States v. Brown*, 555 F.2d 407, 415–16 (5th Cir. 1977), the Fifth Circuit held that the Macon, Georgia, police department is an enterprise. The court observed that the statutory language defining enterprise is broad and, on its face, makes no distinction between the public and private sector. *Id.* at 415. The court relied upon the congressional statement of findings and purposes, quoted *supra* at page 3, to con-

clude that "Congress was concerned with the impact of organized crime on the entire democratic process itself." *Id.* at 416.

The Third Circuit Court of Appeals reached a similar conclusion. In *United States v. Frumento*, 563 F.2d 1083 (3d Cir. 1977), the court held that the Bureau of Cigarette and Beverage Taxes, an agency of the Commonwealth of Pennsylvania, constitutes an enterprise. As noted earlier, the *Frumento* court rejected the application of *ejusdem generis* to limit the definition of enterprise. The opinion contains strong language describing Congress' intent:

> As we read the Organized Crime Control Act, Congress was not so much concerned with limiting the protective and remedial features of the Act to business and labor organizations as it was with reducing the insidious capabilities of persons in organized crime to infiltrate the American economy.

> . . . . .

> In other words, Congress' concern was enlarging the number of tools with which to attack the invasion of the economic life of the country by the cancerous influences of racketeering activity; Congress did not confine its scrutiny to special areas of economic activity. Congress had no reason to adopt a constricted approach to the solution of the problem. Congress was concerned with the infiltration of organized crime into the American economy and to the devastating effects that racketeering activity had upon it. Yet, we are asked to believe that Congress' approach to a monumental problem besetting the country was myopic and artificially contained. Is it conceivable that in considering the ever more widespread tentacles of organized crime in the nation's economic life, Congress intended to ignore an important aspect of the economy because it was state operated and state controlled? We think not.

*Id.* at 1090–91 (footnotes omitted). The forcefulness of the Third Circuit opinion in *Frumento* reflects the vigor of the legislative history.

Of particular relevance to the present case is the following comment by the *Frumento* court:

> [I]n Pennsylvania the Commonwealth is engaged in several of the largest and more affluent business operations in the state, each of which involve many millions of dollars. The Commonwealth of Pennsylvania purchases, distributes, and sells alcoholic beverages legally consumed among its more than 12,000,000 citizens; it sells and distributes games of chance through its much touted lottery system. The constricted reading of the statute advocated by the appellants makes little sense; private business organizations legitimately owned and operated by the states, even though their activities substantially affect interstate commerce, would be open game for racketeers.

*Id.* at 1091 (footnotes omitted).

The State of West Virginia is in the business of buying and selling alcoholic beverages through the ABCC. The ABCC is involved in the importation of liquor across state lines for distribution in West Virginia and enjoys a state-protected monopoly. If the industry were privately-owned, it would unquestionably be an enterprise as defined in Title IX. To exempt state-owned and state-operated businesses from the meaning of enterprise on the basis of their public ownership seems an artificial distinction. Moreover, the resultant loophole contradicts the express purpose of Title IX and the Act.

Finally, the court notes the following observation in the *Mandel* opinion:

> [A]t least part of Congress' concern in enacting Title IX of the Organized Crime Control Act was to enable the relatively small businessman operating in interstate commerce, who was most in need of protection from the criminal tactics of an interstate network of racketeers, to invoke the protection of the federal laws.

415 F.Supp. at 1021. The *Mandel* court characterized the threat of racketeering by state officials as a matter of local concern, adequately and more properly controlled by state law. *Id.* Yet, it is clear from the Act and the legislative history that Congress

believed racketeering activity to be a problem of national scope, and in need of federal enforcement. The small businessman was merely one of the persons and institutions whom Congress intended to protect.

 It should also be observed that the government must prove as an element of a Title IX violation that the enterprise in question affects interstate commerce. The activity charged in the indictment as unlawful must, through operation of the enterprise, affect commerce beyond the parameters of the state. In the present case, the ABCC imports alcoholic beverages from foreign corporations, who in turn allegedly participated in the alleged racketeering activity. Neither the *Mandel* court nor the defendant here questions Congress' authority pursuant to the Commerce Clause to take action in this area. Thus this court, while doubting the accuracy of describing the issue as one of "primarily local concern," *id.* at 1021, concludes in any event that Congress did not perceive it as such, and that an interstate relationship is constitutionally mandated.

Insofar as the district court in *Mandel* may have found a broad exception from Title IX for all public entities, this court respectfully declines to follow that decision. However, whether or not a state, as in *Mandel*, is an enterprise for purposes of a section 1962 violation is a question the court need not, and does not, reach. The court holds today, following a review of the statutory language, the various provisions of the Act, the legislative history, and the case law, that a state agency in the business of wholesaling and retailing alcoholic beverages is an enterprise as that term is defined in section 1961(4).

This opinion does not, of course, indicate any views as to the merit of the government's allegations, nor does it hint at any connection whatsoever between this defendant and the amorphous concept of organized crime. The court concludes only that Count One of the indictment is legally sufficient on its face to withstand pre-trial attack.

Accordingly, it is ORDERED that defendant's motion to dismiss Count One of the indictment be, and the same hereby is, denied.