**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Aubrey THOMPSON, Thomas Edward Sisk and Charles Frederick Taylor, Defendants-Appellants.**

**Nos. 81–5176, 81–5490 and 81–5495.**

United States Court of Appeals, Sixth Circuit.

Argued April 26, 1982.

Decided Aug. 4, 1982.

Certiorari Denied Dec. 6, 1982. See 103 S.Ct. 494.

Henry A. Martin, Haile & Martin, W. Gary Blackburn, Barnett & Alagia, Robert C. Watson, Nashville, Tenn., for defendants-appellants.

Joe B. Brown, U. S. Atty., William Cohen, Asst. U. S. Atty., Nashville, Tenn., William C. Bryson, Chief, Appellate Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before EDWARDS, Chief Judge, and LIVELY, ENGEL, KEITH, BROWN,* KENNEDY, MARTIN, JONES, CONTIE and KRUPANSKY, Circuit Judges.**

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This case was heard en banc on April 26, 1982. The en banc hearing was preceded by a decision of a panel consisting of three thoughtful and experienced judges of this court who had reversed and vacated conditional pleas of guilty tendered by the three defendants in this case. The panel's reasoning was that the United States Attorney's indictment of these three individuals under the Racketeering Influenced and Corrupt Organizations statute, 18 U.S.C. § 1961 *et seq.* (1976), (popularly known as RICO), was fatally defective in the fact that it alleged that the "enterprise" referred to in the RICO statute was "The Office of Governor of the State of Tennessee." The panel held "RICO's remedial provisions show that government entities are neither appropriate nor intended RICO 'enterprises.'" *U. S. v. Thompson*, 669 F.2d 1143, 1148 (6th Cir. 1982).

■ Thus the issue presented on this appeal is: whether appellants' convictions and sentences on voluntary pleas of guilty must be invalidated by this court because, as appellants claim, the indictment under the RICO statute illegally alleged that "The Office of Governor" of the State of Tennessee was the "enterprise" which is an integral part of the RICO statute?

We answer this question in the negative. We do so on the basis of 1) the breadth of RICO's statutory language, 2) the unanimity of judicial precedent on this precise point in other circuits, all of which cases the United States Supreme Court has refused to review, and 3) the legislative history of the RICO statute.

■ We also, however, question the wisdom of continued employment of this form of indictment. The language of the RICO statute allows for but does not compel use of this device. We believe that

---

* Circuit Judge Bailey Brown retired from active service on June 16, 1982, and became a Senior Circuit Judge.

** Circuit Judge Gilbert S. Merritt, did not participate since he sat as a designated District Judge in the District Court proceedings.

identifying "The Office of Governor"[1] (or for that matter any other governmental office) as the "enterprise" under RICO unnecessarily tends to disrupt comity in federal-state relationships and as we will show later in this opinion, the statute itself provides readily available unobjectionable substitute language.

## THE POSTURE OF THIS CASE

This case was heard by the District Court and decided without trial because the three defendants pled guilty. Their pleas to one count of the indictment led to lengthy Rule 11 proceedings before the District Judge designed to test defendants' acquaintance with the allegations of the indictment and the voluntariness of their pleas. The sentences which were entered were in accordance with the terms of the plea agreement. This appeal is taken under an agreement involving the prosecution, the defendants and the court that the sentences would not become final until and unless the legality of the indictment as to the single issue presented here had been tested and affirmed.

## THE FACTS (AS ALLEGED AND ADMITTED)

As a consequence, we recite the facts from the indictment—the factual validity of which each defendant admitted under oath in open court.

The indictment alleged that these three appellants (and two other defendants not involved in this appeal) conspired together (Count I)[2] to solicit and accept bribes for influencing the granting of pardons and paroles and delays or denials of extradition to persons who had been convicted of or charged with crime. Count II[3] detailed the

specific illegal acts related in the preceding sentence. Appellants do not deny their participation in or the illegality of such conduct. Nor do they deny that such activities fall within the racketeering crimes defined by the RICO statute. They do contend with vigor that the indictment's identification of "The Office of Governor" as the "enterprise" referred to in RICO is both a misinterpretation of Congressional intent and an unconstitutional invasion of state authority.

## I. STATUTORY CONSTRUCTION

This court has recently dealt with another attack upon the RICO statute and in its opinion has set forth the broad principles of statutory construction there (and here) involved.

In what follows, we quote from this court's opinion in *United States v. Sutton*, 642 F.2d 1001 (6th Cir. 1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981). The following material describes the breadth and inclusiveness of the RICO statute as adopted by Congress as we described it in *Sutton*. At various points, in italics, we interpolate so as to show the application of this statutory language to our present case:

"Each of the appellants was convicted of conducting the affairs of an 'enterprise' affecting interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (1976), and of conspiracy to commit that offense, in violation of 18 U.S.C. § 1962(d) (1976). The jury returned guilty verdicts as to the nine appellants on 308 counts.

\*     \*     \*     \*     \*     \*

"C.

---

1. The origin of the U. S. Attorney's choice of this form of indictment in this case may have been the controversy in this circuit over whether or not the RICO "enterprise" was required to be "legitimate." This controversy has now been resolved in this circuit by *United States v. Sutton*, 642 F.2d 1001 (6th Cir. 1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981), and, of course, more importantly, by the U. S. Supreme Court in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69

L.Ed.2d 246 (1981). The *Sutton* case was first argued before this court December 1, 1978. The indictment in this case was dated March 15, 1979.

2. Appellants Sisk and Taylor pled guilty to the conspiracy count.

3. Appellant Thompson pled guilty to the substantive count.

"If the meaning of a criminal statute adopted by Congress is clear and unambiguous, then there is no need for the courts to turn to interpretation by means of legislative history or rules of statutory construction. Very recently the Supreme Court in a unanimous opinion has reminded us, 'It is elementary that "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 [95 S.Ct. 1917, 1935, 44 L.Ed.2d 539] (1975) (Powell J., concurring); *see Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330 [98 S.Ct. 2370, 2375, 57 L.Ed.2d 239] (1978); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 472 [97 S.Ct. 1292, 1300, 51 L.Ed.2d 480] (1977).' *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979).

"Title IX, the section which each of these defendants is charged with violating, provides in applicable part:

'It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'

18 U.S.C. § 1962(c) (1976).

"We have previously noted that the dispute in this case concerns the meaning of the term 'enterprise.' *Enterprise* is a common English word which, as indicated in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED, means:

'a. a plan or design for a venture or undertaking

'b. venture, undertaking, project; esp: an undertaking that is difficult, complicated, or has a strong element of risk

'c. a unit of economic organization or activity

'd. any systematic purposeful activity or type of activity.'

"These definitions are all absolutely neutral on the question of whether a particular enterprise is lawful or unlawful [*or we might interpolate 'public or private'*].

"Congress itself, however, recognized that the meaning of *enterprise* was of critical importance in the statute and hence provided a supplementary statutory definition. 18 U.S.C. § 1961 begins with definitions, and the fourth one reads: ' "enterprise" *includes* any individual, partnership, corporation, association, or other legal entity, and any union or *group of individuals associated in fact although not a legal entity;* ....' (Emphasis added.) It should be noted that in this definition, the word 'enterprise' is used without any modifiers, and the same word is employed throughout Title IX without modifiers (except, as we will point out below, the word 'any').

"Obviously Congress would have known how to characterize an illegal enterprise or a legal enterprise had it seen fit to do so. [ *Obviously Congress would also have known how to characterize a private enterprise or a public enterprise had it seen fit to do so.* ] Its choice of the single word 'enterprise' and its actual definition of its seems to us of major importance.

"Over and above the fact that Congress used the word 'enterprise' without modifiers, its definition clearly includes both legal entities and 'any ... group of individuals associated in fact although not a legal entity.'

"Further, under the second section of the statute entitled 'Prohibited Activities,' subsections (b) and (c), Congress employed the word 'enterprise,' modified by the word 'any'; thus, subsection (c) provides: 'It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.' The use of the term 'any' before 'enterprise' helps make clear that 'enterprise' is used in an all encompassing sense. This certainly includes both legal and illegal enterprises. [ *The same breadth may be said to allow for (but not compel) identification of a government office as an*

*'enterprise.'*] In this regard the Second Circuit in *United States v. Altese,* has said:

'In the light of the continued repetition of the word "any" we cannot say that "a reading of the statute" evinces a Congressional intent to eliminate illegitimate businesses from the orbit of the Act. [*Likewise, nothing in this interpretation demonstrates a Congressional intent to exclude state and local governments from the scope of the act.*] On the contrary we find ourselves obliged to say that Title IX in its entirety says in clear, precise and unambiguous language—the use of the word "any"[4]—that all enterprises that are conducted through a pattern of racketeering activity or collection of unlawful debts fall within the interdiction of the Act.'

*United States v. Altese,* 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

\*    \*    \*    \*    \*    \*

"It seems clear that an enterprise engaged in or affecting interstate commerce becomes subject to the criminal sanctions of Title IX when, and only when, it is conducted 'through a pattern of racketeering activity.' In still another and longer section of the definition portion of the statute, Congress defined the specific crimes which are encompassed in the term 'racketeering activity.'[5]

"Appellants were charged, as we have noted above, with an activity and offenses which violated 18 U.S.C. §§ 1962(c) and (d). These two sections provide:

'(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

'(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.'

18 U.S.C. §§ 1962(c), (d) (1976).

\*    \*    \*    \*    \*    \*

"We do not believe that there is any ambiguity to be found in the use of the word 'enterprise' in 18 U.S.C. §§ 1961 and 1962. As a consequence, we see no occasion for employment of the well known canon stated in *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' This is particularly emphasized by the fact that Congress provided specifically that Title IX (the Racketeer Influenced and Corrupt Organizations Act), 'Be liberally construed to effectuate its remedial purposes.' Pub.L.No.91-452, Title IX § 904(a), 84 Stat. 947 (1970).

"Nor do we believe that there is any conflict, overlapping, or ambiguity created by the statute's employment of the terms 'enterprise' and 'pattern of racketeering activity.' Congress itself defined both of these terms in simple and understandable language:

'(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

'(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;'

. . . .

18 U.S.C. §§ 1961(4), (5) (1976).

" 'Enterprise' in the context of this case clearly refers to the organization in which these nine defendants (and others) joined to conduct the organization's affairs. [*'Enterprise' in the context of our present case equally clearly refers to 'The Office of Governor.' Just as clearly, it could on the facts alleged also apply to the organization consisting of these three defendants (and others) engaged in the conspiracy to sell pardons, commutations, etc.*]

" 'Pattern of racketeering activity' refers to the various criminal activities (named by statute) engaged in by the 'enterprise.' "

"4 'Any' is defined in Webster's New International Dictionary, Second Edition, as follows: 'Indicating a person, thing, etc., as one selected without restriction or limitation of choice, with the implication that everyone is open to selection without exception; all, taken distributively; every; used especially in assertions with emphasis on unlimited scope.'

"5 (1) 'racketeering activity' means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, *bribery extortion,* or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: *Section 201 (relating to bribery),* section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), *section 1503 (relating to obstruction of justice) section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of state or local law enforcement),* section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) *any offense involving bankruptcy fraud,* fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States; . . . .
18 U.S.C. § 1961(1) (1976). This section was amended subsequent to the indictments here. *See* 18 U.S.C. § 1961(1) (Supp. III 1979)."4

As a matter of statutory interpretation, we readopt the interpretation of the RICO

statute set forth above. In drafting this statute, Congress chose language which was both clear and broad. Nothing in the statutory language employed by Congress prohibited the United States Attorney from drafting this indictment so as to describe "The Office of Governor of Tennessee" as the "enterprise" here involved. Whether he was required to or should have done so is an entirely different matter upon which we will comment subsequently.

The panel stressed the anomaly of applying RICO's civil remedies to governmental entities. Of course, this case presents no such application. Moreover, we think that the Supreme Court's holding in *United States v. Turkette,* 452 U.S. 576, 585, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981) on a similar point is dispositive here:

> Even if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions (footnote omitted).

We have emphasized the many references Congress made to crimes which primarily or substantially impact upon or make use of units of state or local governments. We believe Congress' inclusion of such crimes as bribery or extortion (through influence on state or local offices), obstruction of justice, obstruction of state or local law enforcement, obstruction of criminal investigation tends to rebut appellants' argument that Congress never intended to assert jurisdiction over a state activity such as that involved in the present indictment.5

## II. THE JUDICIAL PRECEDENT FOR THE FORM OF INDICTMENT CHOSEN BY THE U.S. ATTORNEY

The case law which has already developed nationwide on the question of identifying a

4. In this footnote, we have italicized each crime likely to involve the activities of state and local governments.

5. The panel argued that many of these crimes do not necessarily implicate state and local government officers. For example, it noted

that Tennessee law covers bribery involving only private individuals, yet, it cannot be denied, that the common conception of bribery concerns a crime committed primarily by government officials.

governmental unit as the RICO "enterprise" is unanimous[6] in rejecting appellants' single appellate contention in this case. *United States v. Dozier*, 672 F.2d 531, 543 & n.8 (5th Cir. 1982); *United States v. Angelilli*, 660 F.2d 23, 30–34 (2d Cir. 1981), *cert. denied, sub nom. Butler v. United States*, —— U.S. ——, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); *Sutherland v. United States*, 656 F.2d 1181, 1198, 71 L.Ed.2d 663 (5th Cir. 1981) *cert. denied*, —— U.S. ——, 102 S.Ct. 1451 (1982), and *cert. denied, Maynard v. United States*, —— U.S. ——, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1316–1319 (7th Cir.) (en banc), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981); *United States v. Long*, 651 F.2d 239, 241 (4th Cir.), *cert. denied*, 102 S.Ct. 396 (1981); *United States v. Stratton*, 649 F.2d 1066, 1074–75 (5th Cir. 1981); *United States v. Clark*, 646 F.2d 1259, 1261–1267 (8th Cir. 1981); *United States v. Altomare*, 625 F.2d 5, 7 (4th Cir. 1980); *United States v. Karas*, 624 F.2d 500, 504 (4th Cir. 1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); *United States v. Baker*, 617 F.2d 1060–1061 (4th Cir. 1980); *United States v. Bacheler*, 611 F.2d 443, 450 (3d Cir. 1979); *United States v. Grzywacz*, 603 F.2d 682, 685–687 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *United States v. Frumento*, 563 F.2d 1083, 1089–1092 (3d Cir. 1977), *cert. denied, sub nom. Millhouse v. United States*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978); *United States v. Brown*, 555 F.2d 407, 415–416 (5th Cir. 1977), *cert. denied, sub nom. Seymour v. United States*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *United States v. Vignola*, 464 F.Supp. 1091, 1095–97 (E.D. Pa.), *aff'd mem.*, 605 F.2d 1199 (3d Cir. 1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980).[7]

We note specifically that in the six Court of Appeals cases underlined above, the single issue presented in this case was also presented to the United States Supreme Court on petition for writ of certiorari and in each instance certiorari was denied.

We recognize, of course, that the Supreme Court warns that denial of certiorari should not be accepted as an expression of its decisional authority. Nonetheless, the repeated Supreme Court rejections of efforts on behalf of convicted defendants in at least six cases from four separate circuits to overturn their convictions on grounds identical with that urged by appellants in this case is certainly of more than passing interest.

We should note that this circuit, prior to the panel decision in this appeal, had also decided the same issue in accordance with the result of the circuit court cases listed above—albeit in an unpublished opinion— with somewhat less detailed consideration. *United States v. Durham*, 652 F.2d 59 (6th Cir. 1981) (unpublished opinion).

In the *Durham* case this court foreshadowed this opinion by saying:

Irrespective whether a mere allegation that the Davidson County Criminal Court Clerk's Office constituted the "enterprise" under 18 U.S.C. § 1961(4) (1976), would be sufficient, count one of the indictment, substantially incorporated by reference in count two, extensively sets forth facts in sufficient detail to allege an "enterprise" within the purview of the Act. The indictment here clearly alleged predicate illegal undertakings by a group of individuals working together. In *United States v. Sutton*, 642 F.2d 1001 (6th Cir. 1980), [*cert. denied*, 453 U.S. 912 [101 S.Ct. 3144, 69 L.Ed.2d 995] (1981) ], this court held that there was no statutory requirement under the Act that the "enterprise" referred to be legitimate.

*Id.* at 3.

All of the above having been said, we recognize that the form of indictment employed here has not been approved by the

---

**6.** The only arguable exception is *United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976), *rev'd on other grounds*, 591 F.2d 1347 (4th Cir. 1979), *rev'd en banc*, 602 F.2d 653, 654 (4th Cir. 1979).

**7.** *See also United States v. Barber*, 476 F.Supp. 182, 184–191 (S.D.W.Va.1979), and *United States v. Sisk*, 476 F.Supp. 1061 (M.D.Tenn. 1979).

Supreme Court and is still subject to review there.

### III. LEGISLATIVE HISTORY

It seems clear to us that those who played the leading roles in the enactment of the RICO statute thoroughly understood organized crime's impact upon government entities. Senator McClellan, the chief sponsor of this bill and chairman of the committee which drafted it, said: "To exist and to increase its profits, Mr. President, organized crime has found it necessary to corrupt the institutions of our democratic processes, something no society can tolerate." 115 CONG.REC. 5874 (1969). Further, he said, "For with the necessary expansion of governmental regulation of private and business activity, its power to corrupt has given organized crime greater control over matters affecting the everyday life of each citizen." *Id.* Senator McClellan also pointed out that organized crime had "in some localities, established corrupt alliances within the processes of our democratic society; with the police, prosecutors, courts, and legislatures." 116 CONG.REC. 586 (1970).

Another Senator, Senator Murphy, quoted the conclusion of the President's Crime Commission, "Organized crime flourishes only where it has corrupted local officials." 116 CONG.REC. 962 (1970). Representative St. Germain told the House that "[t]he greatest danger from organized crime lies not in its provision of illegal goods and services, but in its penetration of the country's legitimate institutions. . . . One of the most ominous statistics turned up by the President's Crime Commission in their surveys was the estimated $2 billion paid out each year by organized crime to public officials in and out of the criminal justice system to buy immunity from the law." 116 CONG.REC. 35199–35200 (1970).

We deduce from the above great Congressional concern with organized crime's infiltration of or domination of various aspects of national, state and local governments. We, of course, do not assert that this legislative history demonstrates that Congress ever expressed specific approval of the form of this indictment. But neither do we find any legislative history which suggests or infers disapproval.

From these three sections of this opinion we conclude that the language and plain meaning of the statute does not exclude identification of a governmental office as a RICO enterprise, that the weight of authority thus far developed is unanimously of the view that an indictment cast in this form is within congressional intent and valid, and that a review of legislative history of this statute indicates no contrary legislative intent. Under these circumstances defendants' voluntary pleas of guilty must be affirmed.

We also hold, however, that description of "The Office of Governor" of one of the states of the union as the "enterprise" referred to in RICO is disruptive of comity in federal-state relations. In some cases, such language may also needlessly cast unfair reflection upon innocent individuals.

██ Further, we hold that the probably intended and certainly less debatable form of indictment would be to employ the words of the statute as underlined below:

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union <u>or group of individuals associated in fact although not a legal entity</u>; . . . .

18 U.S.C. § 1961(4) (1976) (emphasis added.)

In this respect, the language which could and we believe preferably should have been employed, would have alleged that the three defendants constituted a "group of individual associated in fact although not a legal entity which made use of the Office of Governor of the State of Tennessee" for the particular racketeering activities alleged in the indictment.

### IV. APPELLANTS' CONSTITUTIONAL CLAIM

██ Appellants also seek to overturn their convictions on the ground that naming the Office of Governor as a RICO enterprise violates the doctrine of *National League of Cities v. Usery*, 426 U.S. 833, 96

S.Ct. 2465, 49 L.Ed.2d 245 (1976). Appellants phrase this argument as follows:

> In the present case, we are dealing with the issue of whether Congress can constitutionally make the remedies of forfeiture, dissolution, etc. available to be applied to the Governor's Office of the State of Tennessee. If RICO can be applied to the Governor's Office of the State of Tennessee, then the sentencing court, under the statutes, has the power to impose all of the available sanctions on the 'enterprise.' Clearly, Congress cannot have meant for the district courts of this nation to have the 'power' to even consider dissolution of a governor's office, or forfeiture of the funds under the governor's office control.

The first answer to appellants' contention in this regard is that this case involves no effort to make use of the civil remedy section of the RICO statute in any fashion. The basic holding of *National League of Cities, supra,* is that Congress cannot exercise its Commerce power where so doing would "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." 426 U.S. at 852, 96 S.Ct. at 2474. Certainly *National League of Cities* does not provide state officials with any general immunity from the reach of federal legislation. In *National League* a three-prong test was applied. First, there must be a showing that the challenged statute "regulates" the "States as States." *Id.* at 854, 96 S.Ct. at 2475. Second, the federal regulations must address matters that are indisputably attributes of state sovereignty. *Id.* at 845, 96 S.Ct. at 2471. Third, it must be apparent that the States' compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional governmental functions. *Id.* at 852, 96 S.Ct. at 2474. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 287–88, 101 S.Ct. 2352, 2365–66, 69 L.Ed.2d 1 (1981). In *National League,* the Supreme Court found that the Tenth Amendment presented an impediment to congressional action after finding that all three requirements were met.

While we have doubts that the RICO statute fits within any of these three requirements, it clearly fails the first test in that it does not "regulate" the "States as States."

Appellants do not tell us, and we cannot conceive, how the RICO statute as applied in this case "regulates" the "States as States." Rather, the RICO statute regulates private conduct by imposing criminal penalties upon individuals who have committed at least two predicate acts of racketeering while associated with or employed by an enterprise affecting interstate commerce. Criminal activity is private activity even when it is carried out in a public forum and even though the activity can only be undertaken by an official's use of a state given power; for example, the power of commutation and prevention of extradition vested in the governor by virtue of his official position.

■ Unlike the congressional action dealt with in *National League* which (unsuccessfully) imposed mandatory minimum federal standards on State employers, the criminal provisions of RICO do not regulate; they do not prescribe conduct but proscribe it; they make no direct, mandatory impact on the enterprise in which RICO's individual defendants are employed or associated; instead, they impose penalties only in the event certain criminal activities occur. Thus appellants' reliance on *National League* fails to meet the very first of the three essential tests set forth in *National League.*

The Tenth Amendment, provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It does not in its terms apply to this case. Article 1, § 8, cl. 3 of the U. S. Constitution specifically delegates to the United States the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; . . . ." Federal prohibition of interstate racketeering is clearly within the constitutional delegation of fed-

eral power over Commerce "among the several States."

The judgments of conviction are affirmed.

LIVELY, Circuit Judge, dissenting.

Though I agree with the majority that it was unwise for the government to charge "The Office of the Governor" of Tennessee as an "enterprise" under RICO, I also believe it was unauthorized. There are three reasons for reaching this conclusion. In the first place, there is no language in the text of the statute which indicates that governmental units were intended to be treated as enterprises for purposes of RICO prosecutions. It is a requirement that there be an enterprise engaged in interstate commerce and that someone employed by or associated with the enterprise conduct its affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c) (1976). RICO contains its own definition of "enterprise"; it includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1976). While it is true that the only modifier of "enterprise" in the RICO definition is the word "any," I do not believe that either the dictionary definition or the statutory definition of the word can reasonably be read to include governmental units. Though the Supreme Court found the statutory definition unambiguous when required to determine whether illegitimate as well as legitimate enterprises are included, *United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981), this finding is not conclusive with respect to the question presently under review. The distinction between legitimate and illegitimate enterprises is quite different from that between purely private activity and that of a governmental unit. In *Turkette* the question was whether Congress intended to reach a particular kind of business enterprise—one that was wholly illegitimate. Here we must determine whether an entirely different kind of activi-

ty was intended to be included. I would require a clear indication of congressional intent before including a governmental unit within the definition of "enterprise."

Further, reading into the language of the Act a construction which includes governmental units within the definition of enterprise creates an internal inconsistency which should be avoided. Some of the civil remedies provided in RICO could not have been intended by Congress to apply to a unit of state government. It is unthinkable that Congress would have intended to authorize a court to "prohibit any person from engaging in the same type of behavior[1] as the enterprise engaged in ..." when that enterprise is the office of the chief executive of a state, or to order "dissolution or reorganization" thereof. 18 U.S.C. § 1964(a). It is true that the Supreme Court in *Turkette* stated that the inapplicability to a particular illegitimate enterprise of one or more of the civil remedies contained in RICO does not lead to the conclusion that existence of such civil remedies limits the scope of the criminal provisions of RICO. 452 U.S. at 585, 101 S.Ct. at 2530. Nevertheless, the fact that Congress included such drastic remedies in RICO without any limitation indicates at least that the treatment of a governmental unit as an enterprise was not considered. In the absence of a clearly stated intent to treat governmental units as enterprises for the purpose of RICO prosecutions, the inclusion of civil remedies which would be beyond the constitutional authority of a federal court to invoke against a unit of state government argues for an interpretation which excludes such units from the definition.

In the second place, I find the legislative history as inconclusive as the language of the Act itself in determining whether a governmental unit was intended to be treated as an enterprise for purposes of a RICO prosecution. The fact that Congress was concerned with political corruption in enacting the Organized Crime Control Act of 1970, P.L. 91–452, is not in dispute. However, RICO is just one part, Title IX, of

---

1. The behavior is that required for operation of the office, not the illegal acts which were per-

formed by persons trading on the prestige of the office.

the Act. References in the legislative history of the Act must be examined carefully to determine whether they refer to a particular section or to the Act as a whole. None of the statements concerning the employment of the Act to root out political corruption cited by the majority appears to have been addressed to Title IX. The legislative history indicates to me that Congress perceived Title I of the Act—relating to special grand juries—as the chief vehicle for fighting political corruption. On the other hand, Title IX was seen as a weapon for combating the economic power wielded by organized crime through the operation of business enterprises, both legitimate and illegitimate. *See United States v. Turkette, supra,* (remarks of various senators quoted in footnotes 13 and 14), 452 U.S. at 591–92, 101 S.Ct. at 2533.

The fact that political corruption was a concern in enacting the entire legislative package which became the Organized Crime Control Act is totally inconclusive on the issue of whether Congress intended to include various units of state governments within a definition which applies only to one of the twelve separate titles of the Act. When various broad statements of purpose are laid aside there remain no explicit references in the legislative history which support a conclusion that the "enterprise" required for a RICO prosecution may consist of a governmental unit. *See United States v. Grzywacz,* 603 F.2d 682, 690–92 (7th Cir. 1979) (Swygert, J., dissenting), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980).

Finally, and perhaps most importantly, the Act should be interpreted in such a way as to avoid straining delicate state-federal relations. There is no provision in the Constitution or statutes of Tennessee establishing "The Office of the Governor." However, Article III, Section 1 provides, "The Supreme Executive power of the state shall be vested in a Governor." The office of the governor is no ordinary enterprise; it is the embodiment of state sovereignty. As the majority opinion makes clear, these three defendants could have been prosecuted under RICO [2] as an "enterprise" consisting of a group of individuals associated in fact. RICO is intended to be broadly construed. However, since neither the language of the statute nor its legislative history requires an interpretation which treats governmental units as RICO enterprises, and since corruption in government can be effectively reached through other provisions of the Organized Crime Control Act of 1970 and other federal criminal laws such as those dealing with extortion and mail fraud, consideration of comity should lead the courts to give RICO a less intrusive interpretation than that adopted by the majority. Instead this court now joins those other courts which have adopted a construction of RICO which is antithetical to the basic concepts of federalism. I would buck this tide and reverse the judgment of the district court.

---

**2.** The proof in this record which is treated as sufficient to establish activities in or affecting interstate commerce is slight. However, these are activities of individuals which would probably establish a sufficient nexus with commerce to support their prosecution as an enterprise of individuals associated in fact. It is quite a different thing to hold that the normal operations of the office of the chief executive of a state may be the basis of treating the office as an enterprise engaged in commerce for the purpose of prosecuting individuals who have misused their connections with that office.